49 N.J. Super. 570 (1958)
140 A.2d 543
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
GEORGE RILEY, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued April 14, 1958.
Decided April 21, 1958.
*573 Before Judges GOLDMANN, FREUND and CONFORD.
Mr. Louis H. Green, assigned counsel, argued the cause for appellant (Mr. George Riley, pro se, on the main brief; Mr. Green on the supplemental brief).
Mr. Solomon Lautman, Assistant Prosecutor of Monmouth County, argued the cause for respondent (Mr. Vincent P. Keuper, Monmouth County Prosecutor, attorney; Mr. Lautman, on the brief).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Defendant George Riley appeals from a judgment of conviction, entered by the Monmouth County Court pursuant to a jury verdict, of the crimes of rape, assault with intent to commit rape, and atrocious assault and battery. The appeal is in forma pauperis, by leave of court. Defendant filed a brief pro se, and thereafter assigned counsel filed a supplemental brief.
The indictment, in three counts, charged George Riley, Lester Riley and Charles Thornton with rape (N.J.S. 2A:138-1) and assault with intent to commit rape (N.J.S. 2A:90-2) upon the person of W, and with atrocious assault and battery (N.J.S. 2A:90-1) upon the person of her male companion M, the crimes allegedly having been committed on February 26, 1957. A severance was granted as to Thornton; the two Rileys were tried and found guilty. Their motion for a new trial on the ground that the verdict was against the weight of the evidence was denied. The court sentenced George Riley to State Prison for not less than 10 nor more than 15 years on the rape charge, and suspended sentence on the other two counts. Lester Riley was sentenced to the New Jersey State Hospital for observation and treatment for a period not to exceed 30 years on the rape count; sentence was suspended on the charge of assault with intent to commit rape, and a suspended sentence of from three to seven years was imposed for the atrocious assault and battery, this sentence to run concurrently *574 with the sentence for rape. Only George Riley appeals.
The testimony on behalf of the State indicated that W, a high school senior aged 18, and her friend M of about the same age, white persons, had been out on a date on the evening of February 26, 1957. On the way home M parked his car in a dark driveway off Grand Avenue in Eatontown, with no lights on the car. W's explanation was that the lights were not working properly and that she and M were sitting in the car listening to the radio "waiting for the lights to cool off." Both testified that nothing improper was going on. Shortly thereafter a car containing defendants George and Lester Riley, their younger brother Melvin, and Charles Thornton, all Negroes, drove into the driveway, its lights blinking as a signal to let them pass. M pulled his car over sufficiently to let defendants' car pass and it stopped a short distance in back and stood there with lights extinguished. After a few minutes all four occupants of the second car approached the first car, opened the doors and someone struck M across the arm and back with a stick. Two of the men, identified by W as George and Lester Riley, pulled her out of the car, pushed her into the back seat of their car, covered her head with a jacket, and then forcibly had sexual relations with her, in the course of which they also struck her several times in and about the head and shoulders. She says she "dazed out." The two men then put W back into M's car and warned them not to tell anyone. The victims drove off and immediately notified the police.
The place of the alleged attack was dark and W's assailants were wearing scarfs across the bottom half of the face. She saw only their eyes and cut of hair  the scarf of one momentarily fell down, but she did not remember which one. Nevertheless, she insisted she could identify the two Rileys.
Thornton, who was with the Rileys, testified for the State. He said that as they passed along Grand Avenue they saw M's parked car and decided to pretend they were police *575 officers and scare the occupants. When they got to the car they saw the boy having sexual intercourse with the girl in the front seat. M jumped up and someone hit him; George Riley took the girl over to his car, some 10 or 15 feet away, and then Lester Riley joined them. He did not see George or Lester get into the Riley car.
The doctor who had examined M and W early on the morning of February 27 testified that M had three welts on his left arm, wrist and left jaw bone. The girl had an abrasion on the left temple and a black and blue mark on her left eye. Her vaginal opening was swollen and irritated, and there was a small laceration with bleeding on the left side of the hymen. Examination of vaginal smears under the microscope showed the presence of fresh sperm. The girl was in a state of shock.
After defendant had unsuccessfully moved for judgment of acquittal on the atrocious assault and battery charge, the two Rileys testified for the defense. Both denied raping the girl or hitting M with a stick. They said that the couple was having intercourse when they came upon them. Both men had been convicted of previous crimes.
In its charge, the court read to the jury the language of the statutes covering the criminal acts, but did not define the necessary elements of either rape or assault with intent to commit rape. The defense made no objection, and the only request was that the court charge that the indictment was not evidence of guilt. This was granted. The jury, after requesting and receiving further instructions, returned a verdict of guilty for each of the defendants on each count.
Before considering that aspect of the appeal which involves the count charging rape, it would be well to dispose of the points raised by defendants as to the other two counts.
Defendant argues that conviction on the second count charging assault with intent to commit rape, and the suspended sentence imposed thereon, were illegal. The rules provide for an appeal even though a suspended sentence is imposed, R.R. 1:2-4. Assault with intent to commit rape and its actual commission are parts of one and the same *576 transaction and constitute but one crime. The State so concedes, and indeed, our courts have in effect so held. Cook v. State, 24 N.J.L. 843 (E. & A. 1855); cf. State v. Hill, 44 N.J. Super. 110 (App. Div. 1957); State v. Landeros, 32 N.J. Super. 168 (App. Div. 1954), reversed on other grounds, 20 N.J. 69 (1955). It was error for the trial court to authorize the jury to bring back a verdict of guilty on the assault with intent to commit rape count as well as the rape count. The judgment of conviction on the second count of the indictment charging assault with the intent to commit rape must therefore be reversed.
Defendant also contends that the verdict of guilty on the third count of the indictment charging atrocious assault and battery was contrary to the weight of the evidence. We find nothing in the testimony identifying either of the defendants George Riley or Lester Riley as the person who wielded the stick on M, so that the judgment of conviction on this count must be reversed. This makes unnecessary any consideration of defendant's argument that "wounding," as used in N.J.S. 2A:90-1 ("Any person who commits an atrocious assault and battery by maiming or wounding another is guilty of a high misdemeanor") requires an actual breaking of the skin. The testimony here is undisputed that the injury inflicted consisted only of welts and bruises and that M's skin had not been broken. Although the court in State v. Capawanna, 118 N.J.L. 429 (Sup. Ct. 1937), affirmed 119 N.J.L. 337 (E. & A. 1938), stated that little has been said in our cases in definition of the term "wounding" because the meaning is "rather obvious," and cited certain definitions of "wound" (118 N.J.L. at page 432), it did not attempt to determine whether a breaking of the skin was necessary. The court only concluded that where the maiming or wounding is done by an assault and battery that is "savagely brutal or outrageously or inhumanly cruel or violent," the statutory language has been met, and held that to constitute an atrocious assault and battery it need not be shown that the maiming or wounding was accomplished by the use of *577 a weapon or implement. Subsequent cases, in differentiating atrocious from simple assault and battery, have done little more than enunciate these criteria, which obviously are concerned only with the quality of the attack itself and not with the objective injury inflicted. We note, incidentally, that the weight of authority in other jurisdictions seems to be in accord with defendant's contention, it being rather widely held that the crime of unlawfully wounding with intent to maim requires that there must be a complete parting or solution of the skin. See Annotation, 16 A.L.R. 955, 958 (1922); Harris v. Commonwealth, 150 Va. 580, 142 S.E. 354, 58 A.L.R. 1316 (Sup. Ct. App. 1928).
We deal now with the main point of the appeal  defendant's contention that the manner and extent of the trial judge's participation in the examination and cross-examination of witnesses exceeded the bounds of judicial propriety and operated to deprive defendant of a fair trial.
The State's main witness was, of course, W. After preliminary questioning by the prosecutor which developed testimony as to the parking of the M car in the driveway, the approach of the Riley car, and the identification of George and Lester Riley, she was asked what happened when she was taken to the back seat of the Riley car. She replied, "Well, I guess I got hysterical. I don't know what was going on too clearly, but they pushed me all the way down on the seat and then something [sic] kept smacking me with the back of their hand, trying to make me be quiet, not to make a sound * * * [E]verything just went black and dazed like. It wasn't clear." She was then asked, "And then what is the next thing that you know happened?" There was nothing unclear about this inquiry, and it readily could have been answered by the complaining witness. It may be that she hesitated for a moment, or was embarrassed  the record does not indicate  but before she could answer the court took over the direct examination. With the exception of two questions put by the prosecutor, the entire interrogation, extending over some 38 questions, was conducted by the court.
*578 This, in and of itself, is not necessarily to be regarded as improper if the court reasonably entertained the view that the witness hesitated to give the details because of natural embarrassment or reluctance under the circumstances. What is of concern, however, is the leading nature of some of the questions. It is possible that actual rape never happened. While the witness' nervousness or reluctance, if reluctance there was, may have been engendered by modesty, yet, on the other hand, her hesitation may actually have been due to her unwillingness to tell an untruth. Whatever the case, the persistent questioning of the trial judge was clearly designed to draw out vitally incriminating testimony. By continuing to press the witness with questions having that plain effect, he could not help but convey to the jury that he was concerned with developing incriminating detail and, to that extent, create the impression in the jury's minds that defendants in some way were guilty of the crime charged. Some of the questions were pointedly leading. The judge asked the witness whether all her clothes were on, whether they were still in the same shape. He inquired about her petticoat and panties, and what if anything was happening to the panties. Eventually, he asked her, "Can you tell us what else occurred?" and the answer was, "Well, I dazed out."
The court's questioning on direct examination concluded with the following:
"Q. You don't know anything else then? A. Then I felt someone hitting me again.
Q. Hitting you? A. Yes.
Q. Where? A. Across my face and my head, and my head hit the back of the door.
Q. Did one of those men get off and another one get on? A. Yes.
Q. Do you remember that much? A. Yes, sir.
Q. Do you remember anything being done to you when either one or both of these men were on you? A. Yes, sir.
Q. What? A. I was being raped.
Q. What do you mean by raped? You mean someone was having intercourse with you? A. Yes.
Q. Do you know what intercourse is? A. Yes, sir.
Q. You are sure about that? A. Yes, sir.
*579 Q. You are sure that both of these men raped you? A. Yes.
Q. Both of these men had intercourse with you? A. Yes, sir."
The defense entered an objection to the entire line of questions by the court. It is to be noted that the witness' statement that she was "being raped" was simply a statement of a conclusion, and further substantiation was supplied exclusively through leading questions by the court.
More significant than this was what happened when the trial judge questioned W on cross-examination. The purpose of cross-examination is, of course, to expose possible inconsistencies, weaknesses or other aspects of lack of credibility. Although the questions put to the witness by defense counsel on cross-examination called for responsive answers which would have required her to repeat the details of the alleged rape, she abstained from giving those details until the court interrupted the examination and took over the questioning.
After the witness had gotten to the point of telling how she was pushed into the back seat of the Riley car, defense counsel asked "And then what happened?" The witness said "Must I repeat it?", at which point the court indicated she would have to, saying, "He wants to see whether you tell the same story. So go ahead." Although this gave the witness her opportunity to repeat exactly what had happened to her, she failed to do so but said merely that the man had threatened to kill her and "Then I felt something on top of me, and then after he got off the other one came around, and one of them, both of them hit me across my face." Again she was asked what happened and the answer was, "I don't know. Everything went black, and then something felt like it hit me again and something scratched my face like a zipper." At this point the witness had apparently finished what she had to say, but her testimony had not spelled out rape.
Later in the cross-examination defense counsel returned to the matter and asked, "You said you were being raped?" Her answer was, "I don't know what you mean." The *580 question was repeated. The question was clear enough, and the witness, an 18-year-old high school senior, intelligent enough to supply a clear answer. However, at this crucial point the trial judge, instead of permitting the witness to make her own answer, took over in a manner clearly designed to get her to repeat the same details she had given on direct examination. His prodding elicited the necessary incriminatory description. The court's concluding questions pressed the witness to explain what she meant by the word "intercourse." Finally the following ensued:
"A. These black things were on top of me and inside of me.
Q. You mean of your body? A. Yes, sir.

* * * * * * * *
Q. You say you felt a part of their body in your body? A. Yes.
Q. Inside of your body? A. Yes.
Q. That is what you mean? Are you talking about the genital organ of a male? A. Yes.
Q. You are a high school student. You are a senior? A. Yes.
Q. You know what the genital organs are? A. Yes, sir."
At this point the court permitted counsel to resume his cross-examination.
What is objectionable in all this is that it clearly undermined the presumption to which every defendant in a criminal case is entitled  that of his innocence. It is the State's function to establish his guilt. In view of the testimony of the State's own witness, Thornton, who said that M and W were engaged in sexual intercourse when the defendants came upon the scene  this testimony being corroborated by defendants themselves  the case presented the distinct possibility that the charge of rape was used to cover up the misconduct of the couple. It is entirely possible, whether or not we think it likely, that the girl's unwillingness to testify concerning details was because they were not true. The Rileys were entitled to have the jury appraise her truthfulness on the basis of her voluntary testimony, elicited in a normal manner by the able and experienced assistant prosecutor who was trying the case, and were particularly entitled to test it on cross-examination *581 without the trial court unnecessarily interrupting, with the result of buttressing her story when it appeared to bog down.
We recognize the general rule that a trial judge may question witnesses in a criminal case, and that such examination lies largely in discretion. However, he should not by the form, manner or extent of his questioning, in any way indicate to the jury his opinion as to defendant's guilt or the weight or sufficiency of the evidence, and he should observe the principles governing the examination of witnesses generally. The harmfulness of the trial judge's intrusion here was two-fold. The fact that the questions were being asked by the court may have prompted the witness to answer untruthfully; hesitating to go beyond the boundaries of truth, she may have been afraid to hesitate when pressed by the court's questions. Further, the trial judge's entering into the examination in the manner and to the extent he did carried the potential of conveying to the jury the impression that he was satisfied defendants were guilty and concerned with having the complaining witness supply the incriminating details, even to the extent of emphasizing her answers by his repetition of them. Answers to questions put by the court are likely to carry more weight with a jury than answers to questions put by the prosecutor or counsel. We note from the court's charge that the jury had just begun its term of service, and for some members this was perhaps their first experience in a criminal trial.
The cases generally hold that the only purpose a trial judge can properly have in taking part in the examination of witnesses in a criminal case is to discover the truth when, in his opinion, the witness has not testified with entire frankness, or when counsel has failed or been unable to elicit some material fact, or the witness is recalcitrant, or there is need for clarification. Brief interrogation is ordinarily sufficient to accomplish this purpose; protracted examination has the natural tendency of indicating his opinion on the facts, or possibly as to the credibility of the witness. Accordingly, reviewing courts are inclined to look with disfavor upon an extended examination of the witness by *582 the trial judge, unless there is patently nothing unfair in the judge's attitude or in the form of his questions. Annotation, 84 A.L.R. 1172 et seq. (1933). The latest expression on the subject may be found in 3 Wharton's Criminal Evidence (12th ed. 1955), § 842, p. 213:
"Whether or not the trial court shall question a witness, and the extent of its examination, are within its sound discretion. The trial court should, however, exercise its right to call and examine a witness with great care, and should do so only when without such examination there may be a miscarriage of justice, lest the jury, because of such intervention, indulge in adverse inferences and conclusions from the testimony of the witness. Therefore, the trial judge should examine witnesses only in rare instances and then only by a few questions necessary to clear up the situation, it being better to suggest to counsel the additional information desired and let him ask the questions.
The examination by the court should be confined within the limits applicable to the examination by counsel, and the court should not subject the witness to extensive questioning or embark upon a new line of questioning.
When the court examines a witness, it must do so in a fair and impartial manner, and must be scrupulously careful to avoid indicating to the jury its opinion as to the guilt or innocence of the defendant, especially when the court is questioning the defendant. It is prejudicial error if the court indicates any opinion or shows any prejudice against the defendant."
We have no doubt that the trial judge intended no more than to elicit all the facts material to the question of the Rileys' guilt or innocence, but we equally have no doubt that the actual effect of his interrogations heavily balanced the scale against them. We consider that the intervention of the trial judge in the critical areas of the direct and cross-examination, the extent and timing of his questioning, the leading character of some of his questions, and his emphatic repetition of some of the most damaging answers thus elicited, taken in entirety, exceed the limit of permissible discretion. Defense counsel had objected to the whole line of the trial judge's questions on direct examination, but failed to make formal objection when he questioned the complaining witness in the course of her cross-examination. Nonetheless, we notice plain error, R.R. 1:5-1 (a), 2:5.
*583 Defendant has cited a number of other allegedly prejudicial directions and comments by the court. Some of these were not at all improper, but others, in combination with the court's examination of the principal State witness, tended to exert a total cumulative prejudicial effect against the Rileys. State v. Orecchio, 16 N.J. 125 (1954).
We are satisfied that defendant's rights were so prejudiced as to deprive him of a fair and impartial trial, requiring reversal of the conviction on the rape charge.
Our disposition makes unnecessary consideration of defendant's argument that the trial court's charge prejudiced his substantial rights. There was no objection to the charge, or any request that any of the three crimes for which defendant stood trial be defined. The court in State v. Capawanna, above, 118 N.J.L. 429 (Sup. Ct. 1937), affirmed 119 N.J.L. 337 (E. & A. 1938), flatly held that "there is no duty upon the trial court in a criminal case to charge the jury at all unless there be a request to do so. The court is not obliged to define the crime and may send the case to the jury for consideration without any instruction." However, that case was decided a decade before the adoption of our court rules which provide for appellate notice of plain error committed on the trial level. The rule adopted by the Capawanna court would allow a jury to pass upon the life or liberty of an individual, no matter how complex the elements of the crime or interdependent the issues, or how close the proofs, without giving the jury any guide whatsoever as to what constitutes the criminal offense. This is completely obnoxious to the principle, inherent in our present-day concept of criminal justice, that the zealous protection of the rights of a criminal defendant to a fair trial is basic to our form of government.
In its charge the court limited itself to reading the following part of N.J.S. 2A:138-1 to the jury:
"Any person who has carnal knowledge of a woman forcibly against her will, or while she is under the influence of any narcotic drug, or who, being of the age of 16 or over, unlawfully and carnally abuses a woman-child under the age of 12 years, with or without *584 her consent, is guilty of a high misdemeanor, * * *; or who, being of the age of 16 or over, unlawfully and carnally abuses a woman-child of the age of 12 years or over, but under the age of 16 years, with or without her consent, is guilty of a high misdemeanor, * * *."
Defendant's chief complaint is the failure of the court to define "carnal knowledge." The law is clear that what is required to constitute rape or forcible carnal knowledge is actual sexual penetration. Application of Faas, 42 N.J. Super. 31, 35 (App. Div. 1956). In State v. Orlando, 119 N.J.L. 175, 183 (Sup. Ct. 1937), the court, by Justice Trenchard, said, in approving the trial court's charge on the subject of rape:
"* * * Considered in its entirety the instruction of this topic was that to convict the defendant of rape the jury must find that he had sexual intercourse with the prosecutrix forcibly and against her will; that to complete the crime of rape there must be penetration by the sexual organ of the male in the sexual organ of the female, and that the slightest penetration is sufficient. That was right."
It is doubtful whether the average layman knows that carnal knowledge, as used in the statute, requires actual penetration, so that where there is doubt as to the proof of penetration, the court would have a duty to instruct thereon, even in the absence of a request by defense counsel. It is to be remembered that in this case, there was testimony by the State's witness and defendants that they found the couple indulging in sexual intercourse. This, taken with the prosecutrix' marked hesitancy to testify as to penetration, called for an instruction thereon so as to insure a fair and rational weighing of the proofs by the jury, and thereby avoid the plain error rule.
Defendant's conviction on the charges of assault with intent to commit rape and atrocious assault and battery is reversed. His conviction on the charge of rape is reversed with the direction that there be a new trial. Although Lester Riley does not appeal, his conviction on the rape charge should also be reversed and a new trial had.