62 N.J. Super. 339 (1960)
162 A.2d 911
THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
LLEWELLYN J. BOWDEN, DEFENDANT-APPELLANT. THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
ROY G. DUFFY, DEFENDANT-APPELLANT.
(Docket Nos. A-112-59, A-138-59).
Superior Court of New Jersey, Appellate Division.
Argued June 13, 1960.
Decided July 5, 1960.
*342 Before Judges GOLDMANN, CONFORD and HANEMAN.
Mr. Warren E. Dunn (assigned counsel) argued the cause for defendant-appellant Llewellyn J. Bowden (Mr. Theodore L. Abeles, attorney).
Mr. Vincent M. Mangino (assigned counsel) argued the cause for defendant-appellant Roy G. Duffy.
Mr. Brendan T. Byrne, Essex County Prosecutor, argued the cause for plaintiff-respondent (Messrs. Joseph P. Lordi, Milton N. Diamond, and Sanford M. Jaffe, attorneys).
The opinion of the court was delivered by CONFORD, J.A.D.
By these appeals defendants bring in question their convictions in the Essex County Court after trial by jury on an indictment for armed robbery. The general factual background follows:
The Triumph Savings & Loan Association in the City of Newark was held up on April 11, 1958 by two armed and masked bandits who took, at gun-point, some $800 from the cash drawers of tellers Beard and Ulrich. As the two gunmen were making their escape, the bank manager, rushing out of the premises, enlisted the aid of four young men who happened to be outside, and the five gave chase. They saw the bandits enter an automobile and drive off. One of them observed the license plate number, and that information was relayed to the police. The car was thereby identified *343 as registered in the name of the wife of the defendant Bowden. Bowden was apprehended driving the car that same evening by New York State police at Leeds, New York, near Albany. He was returned to New Jersey the following day and was held in the custody of the Newark police until his arraignment the following Wednesday, April 16, 1958. The day before, Tuesday, April 15, 1958, he had given a detailed confession, implicating Duffy as well, and was taken by the police to the campus of Upsala College in East Orange to point out the spot where he had hidden the proceeds of the robbery. There a paper bag containing about $350 was found buried under a tree. On the trip back to police headquarters Bowden showed the police the sewer into which he said he had thrown the two guns, and they were retrieved therefrom later in the day.
Defendant Duffy was arrested on April 12, 1958, the day after the robbery, by F.B.I. agents. He was released after questioning, picked up again Monday evening, April 14, 1958, again released, and immediately thereafter arrested by the Newark police and questioned that night. The following day, Tuesday, April 15, 1958, Duffy also gave a full confession, and that afternoon the police went to his home, where his wife gave them a posted and sealed envelope addressed to himself containing several hundred dollars. He, too, was arraigned on Wednesday, April 16, 1958. Both suspects pleaded not guilty.
At their trial both defendants claimed that their confessions had been coerced by police brutality and that the implicating details were untrue. Both denied participation in the robbery.
Bowden's story was that about a week before the holdup he had been in a Newark bar with two friends and had engaged in conversation with an unidentified woman. There was some sort of commotion in the bar, the woman and some companions of hers ran out, and he picked up her handbag, which had been left on the bar, intending to return it at some later time. His inspection of its contents, however, *344 revealed a substantial amount of money and the two weapons. He buried the money, and, on the advice of another friend, threw the weapons into the sewer. All three friends testified on his behalf, corroborating these events. On the day of the crime itself, he said, he had spent the morning with Duffy, and had then gone to see another friend, one Albert Berman, who was a student at Upsala. Although Berman had already given the police a statement in which he denied having seen Bowden that day, nevertheless at trial he said that the statement had been coerced by police pressure and that in fact Bowden had been with him at the very time the holdup was taking place. Bowden testified that the reason he had left Newark was his fear of being questioned concerning the purloined handbag.
Duffy claimed that the money in the self-addressed envelope represented the proceeds of an income tax rebate check which he had cashed. He had no specific alibi.
After a lengthy collateral attack on the confessions, they were ruled admissible, and the investigating police testified to various oral admissions made to them by the defendants.
On this appeal, both defendants attack the sufficiency of the indictment and urge various alleged prejudicial trial errors, including the ruling on admissibility of their confessions.

I.
The defendants first contend that their convictions are a nullity because the indictment on which they were based was fatally defective in its complete failure to specify the ownership of the stolen property. They argue that since this omitted allegation constitutes an essential element of the crime of robbery, it was error for the court to have allowed the indictment to be amended in this regard.
The first count of the original indictment read as follows:
"The Grand Jurors of the State of New Jersey, for the County of Essex, upon their oath present that Llewellyn Bowden and Roy *345 G. Duffy, on the 11th day of April, 1958, at the City of Newark, in the County of Essex aforesaid and within the jurisdiction of this court, did forcibly take from the person of Stella Beard money to the value of $825.00, by violence and putting the said Stella Beard in fear, contrary to the provisions of N.J.S. 2A:141-1, against the peace of this State, the government and dignity of the same."
Defendants' pretrial motion to quash the indictment was denied, and the State's offer at that time to amend it to allege ownership of the money in the Triumph Federal Savings & Loan Association was also denied, the court ruling that amendment was not necessary since the proffered allegation was not essential. It did, however, permit the amendment later in the proceedings.
Defendants are correct in their assertion that one of the elements of the crime of robbery is the taking of property which belongs to someone other than the thief. State v. Cottone, 52 N.J. Super. 316, 323 (App. Div. 1958). The same is true of the crime of larceny, State v. Cohen, 105 N.J.L. 529, 536-7 (Sup. Ct. 1929); State v. Trunfio, 58 N.J. Super. 445, 448 (App. Div. 1959); State v. Davis, 61 N.J. Super. 536 (App. Div. 1960), which is a necessary component of robbery, the latter being defined as larceny from the person of another accomplished with the element of force or fear. State v. Hoag, 35 N.J. Super. 555, 559 (App. Div. 1955), affirmed 21 N.J. 496 (1956), affirmed 356 U.S. 464, 78 S.Ct. 829, 2 L.Ed.2d 1375 (1958); State v. McDonald, 89 N.J.L. 421, 423 (Sup. Ct. 1916), affirmed 91 N.J.L. 233, 236 (E. & A. 1918). The statute covering robbery, however, makes no specific reference to the element of ownership of the stolen goods being in one other than the thief, or, indeed, to the subject of ownership at all, the offense being stated as "forcibly tak[ing] from the person of another, money or personal goods and chattels, of any value whatsoever, by violence or putting him in fear * * *." N.J.S. 2A:141-1. Compare also N.J.S. 2A:119-1, defining larceny from the person without reference to the ownership of the goods stolen, with N.J.S. 2A:119-2, *346 the general statute covering stealing, which does expressly refer to "the property of another."
As has been pointed out in our cases, the essence of the crimes of larceny and robbery (as regards their "taking" aspect) "is not that the property belonged to a specific person, but rather that it was the property of someone other than the thief." State v. Trunfio, supra (58 N.J. Super., at p. 448). And see, generally, 77 C.J.S. Robbery, § 38, p. 475. The question before us, therefore, is as to whether the original indictment, following as it did the statutory language, was sufficient to negate ownership of the stolen property in defendants.
There is no New Jersey case precisely in point. Distinguishable are those cases in which there was a variance between the ownership proved at trial and that alleged in the indictment, the rule there evolved being that the variance is immaterial at least so long as the person alleged to be the owner in the indictment had the right to possession as against the thief. See, e.g., State v. Cottone, supra; State v. Trunfio, supra; State v. Davis, supra. State v. Cohen, supra, the continuing validity of which was questioned in Trunfio, is the only case in which the indictment was held to be defective, but there the alleged owner was actually a stranger to the goods. There is no doubt that under these authorities Stella Beard was properly designable as the owner for purposes of the indictment. See also State v. Butler, 27 N.J. 560, 590 et seq. (1958).
It is not argued by defendants that the statute, N.J.S. 2A:141-1, in any way changes the substance of the common-law offense of robbery. Hence the negation of ownership of the stolen goods in the thief is implicit in the statutory formulation of the crime. In order for goods to be taken "from the person of another" that person obviously must have possession of them. And the element of the crime inferred from the statutory language, thus, is the existence in the individual from whose person the goods are taken, as against the thief, of a right to possession thereof. *347 If implicit in the statutory statement of the elements of the crime, it would seem, absent any showing of prejudice by these defendants, that negation of ownership by defendants is likewise sufficiently implicit in the indictment, which adopts the statutory language. Defendants cannot and do not urge that the property stolen from the bank tellers belonged to them. Nor do they argue that the failure to specify ownership resulted in their being insufficiently apprised of the crime with which they were charged or in any other way prejudiced in making their defense. Neither do they contend that the amended indictment varied the crime or subjected them to any new or different penal liability. Cf. State v. Grothmann, 13 N.J. 90, 95 (1953); R.R. 3:4-3; R.R. 3:4-5.
Pertinent to this problem is the language of the court in State v. Morano, 134 N.J.L. 295, 296-7 (E. & A. 1946), where it was stated:
"Certainty of description of the offense charged is a prime requisite of an indictment. This requirement that the alleged criminal act be laid in certain and identifiable form is grounded in the accused's right to such specification of the accusation as may be needful for the preparation of his defense and the interposition of a plea of autrefois convict or autrefois acquit in the event of a further prosecution for the same offense. The accused has a constitutional right `to be informed of the nature and cause of the accusation' levelled against him. State Constitution, Art. I, par. 8. It is a corollary of this principle that an offense may be charged in the words of the statute, if the statute describes it in terms that in themselves import with certainty the elements of the offense, and thus the allegation satisfies the accused's fundamental rights. The statutory language need be supplemented only where necessary to particularize and identify the offense that would be indefinite and uncertain because of the generality of the statutory language" (emphasis ours).
There can be no question that the indictment here, following the statutory language, did sufficiently identify and particularize the crime with which defendants were charged. Proper solicitude for the observance of all the constitutional and statutory rights of defendants in criminal proceedings *348 does not require going to the extremity of voiding an indictment plainly specifying the crime charged, merely because one element, factually undenied, is stated by unambiguous implication, and in haec verba of the statutory specification of the offense.
It may well be preferable for a robbery indictment to expressly negate ownership in the accused. But where the defendants can show no respect in which that failure has prejudiced their substantive rights, there appears no compelling reason, dictated by any of the considerations of fairness to criminal defendants, which would warrant invalidating the indictment at the expense of the State's interest. If there was any defect here at all, and we think not, it was at most one of form rather than of substance, and the indictment was properly amended.

II.
Both Bowden and Duffy contend that because their confessions were the result of police brutality it was error for the court to have admitted them into evidence. The collateral attack on the confessions consumed a major portion of the ten-day trial.
The accepted rule for appellate review of the trial court determination of the voluntary character of a confession is that it be left undisturbed where there is sufficient evidence to support it, even though the totality of evidence is in conflict. See, e.g., State v. Rios, 17 N.J. 572, 600 (1955); State v. Walker, 15 N.J. 485, 490-491 (1954); State v. Vaszorich, 13 N.J. 99, 108 (1953), certiorari denied 346 U.S. 900, 74 S.Ct. 219, 98 L.Ed. 400 (1953); State v. Pierce, 4 N.J. 252, 258 (1950). That rule has been given thoughtful study and further rationalization in the recent Supreme Court decision in State v. Smith and Stanford, 32 N.J. 501 (1960), holding that: "[I]n view of the wide range of inquiry insisted upon by the United States Supreme Court on the constitutional issue * * * we will carefully *349 review and weigh all the evidence on the question and determine its adequacy and the correctness of the determination in the same fashion as we do in the case of an appealed judgment in a non-jury criminal matter, giving full regard, of course, to the opportunity of the trial court to judge of the credibility of the witnesses. R.R. 1:5-4(b)" (at p. 549). In other words, subject to the caveat as to matters of credibility, the appellate court will make new or amended findings of fact on the voluntariness of the confession where justice appears to require it.
A careful review of the evidence satisfies us that as to Bowden, contrary to the conclusion of the trial court, the signed confession should have been excluded as coerced by the Newark police, and that we must so declare, in our appellate capacity, under the Smith and Stanford rule cited above.
The undisputed facts as to Bowden are these. He was apprehended in Leeds, New York, by the New York State police on Friday evening, April 11, 1958, the day of the crime, while driving to Albany. Newark police detectives Hull, Heiss and Nisivoccia, pursuant to notification of the arrest, arrived in Leeds the following afternoon, Saturday, April 12. Defendant waived extradition proceedings and returned to New Jersey in the custody of Nisivoccia and Heiss, Hull driving defendant's automobile back. The party arrived at Newark police headquarters, after a brief stop en route for food, at about 7:30 P.M. Saturday night, and defendant was brought to the small bandit squad room (8' x 15') located off the main squad room at headquarters, and accessible only through it. He was questioned, slated and photographed, and put in a cell by 8:00 P.M.
The next morning, Sunday, April 13, at 11:15 A.M., Bowden was removed from his cell and brought again to the small room for questioning by Hull, Heiss, Nisivoccia and Lieutenant Kinney, the last in charge of the investigation. At that session he gave a non-incriminatory statement in question and answer form and was returned to his cell *350 at 2:35 P.M. The next interrogation, lasting for a half hour, was held Monday morning, and conducted by Heiss and Nisivoccia, Kinney walking in and out of the small room during the questioning. On Monday evening Bowden was removed from his cell at about 9:30 P.M., confronted by Duffy, who had just been taken into custody by the Newark police, and questioned in the small room until shortly after 11:00 P.M.
Tuesday was the day of the confession. After being interrogated in the small room by Hull, Heiss, and Nisivoccia in the intermittent presence of Kinney for about an hour and a quarter in the morning, Bowden was then taken on the trip to Upsala College, referred to above. On the return to the small room, at about 1:00 P.M., Duffy was already in the process of giving a confession to Detectives King and Lissenden. Bowden was again interrogated for a few minutes and his confession then taken. Upon the completion of the confessions and their signing and notarization several hours later, the two defendants were placed in various line-ups and finally returned to their cells at 5:30 P.M., each after a full day in the custody of the investigating detectives. Early Wednesday morning, shortly after Tuesday midnight, Bowden was again out of his cell for approximately three quarters of an hour for an interview with his father, who was also a member of the Newark police department, this apparently being Bowden's first contact with his family since his arrest. Both defendants were arraigned Wednesday morning before a Newark magistrate, no member of either family being notified or present. Both pleaded not guilty.
At some time which does not clearly appear, but apparently on Wednesday, Bowden spoke briefly with his mother and sister outside the cell block. After the arraignment Bowden was again taken to the small room for an interview with his mother, father and wife. The following day, Thursday, April 17, he was transferred to the county jail at Newark Street. On Friday he was examined by the county jail surgeon, Dr. Duffy, released on bail, the money for which *351 had been put up by a friend of his father, and immediately taken by his family to a doctor for examination. The following day Bowden visited a photographer's studio, where several black and white photographs of his face and body were taken.
Bowden's testimony concerning his mistreatment by the Newark police was substantially as follows. On the way back from Leeds, New York, he was interrogated by the police, but not mistreated. Detective Nisivoccia, however, said to him, "I will make you talk when you get back to Newark."
Bowden was not clear as to just what features of his mistreatment took place on any of the particular dates of his confinement. His recollections were of a period of beatings and verbal abuse. Beginning with the interrogation Saturday night he was constantly accused by Nisivoccia and Heiss of having committed the crime although he repeatedly told them he was not guilty and could explain his whereabouts, and was assaulted by them with rubber hoses and by blows of the fists, and kicked. The interrogation was peppered with obscenities. The first night, he said, "* * * my leg was kicked, my head was bumped 14 or 15 different times, my arm was hit with a rubber hose. There were bruises, great, big bruises on * * * my chest, my neck. The one in the stomach didn't leave any bruise  a kick." They avoided hitting his face. Both detectives had hoses. The hoses were kept in a desk drawer in the room. The detectives referred to his wife as the "woman [he] was living with," said she was a prostitute and had infected him with syphilis, and that they were going to have her deported. He had only had a lunch of two hamburgers that day, on the way from New York, but received no supper because this was served in the cell block while he was being questioned. Meals, when he got any, consisted of "one slice of baloney, a piece of bread and a cup of coffee." The first night he gave a statement which did not implicate himself.
The beatings continued at each interrogation session until he confessed. When asked why he signed the confession *352 statement, he said, "I couldn't take any more of the beatings. I could take a good beating but I couldn't take that no more. I couldn't take any more, and I would sign anything that they handed in front of me. I don't even remember the man that was sitting up here. That's how dizzy I was with all those hoses hitting me on the head by Nisivoccia and Heiss." Moreover, he said he had had nothing to eat for a day and a half or two days before signing the confession.
On cross-examination, he said there were "two great big beatings" and many intervening smaller beatings. The only ones who used force on him were Nisivoccia and Heiss. He was told by them not to complain about being beaten when arraigned  that he should just plead "not guilty" and get it "over with."
Beginning with the time of his return to Newark he "repeatedly" requested an opportunity to see members of his family or a lawyer, or to make a phone call. All such requests were refused "until [he] was beat into putting [his] name on the piece of paper," and after his arraignment. Whenever he made such a request "there would just be more profanity and more beatings; somebody would belt [him] off the stool or hit [him] with a hose."
After the confinement was over there were bruises and discolorations on his right leg, left arm, forearms, both sides of the upper part of his chest, and on his hands.
Bowden's mother, father, sister and wife all testified to observing bruises, contusions and lacerations on his arms, legs, chest and neck, and lumps on his head. The mother and father further testified that when they saw Bowden in the small room after his arraignment, he pointed out to them the two rubber hoses with which he had been beaten lying in an aperture in one of the tables. The father measured the hoses and found them 17 inches long and 1 1/2 inches wide, slightly curved in shape. He also testified that in common police department parlance the small room was known as the "sweat box," the "steam room," and the "third degree" room. At some time after Bowden's release *353 on bail, his mother, so she testified, made complaints about her son's beating to the Essex County Prosecutor's office and was referred by an assistant there to the chief of police. The father made no complaint or report to any of his police superiors or to any other authority, but did speak to Detective Kerr about his son's injuries.
The friend who had put up bail money saw Bowden immediately after his release and also testified to observing vari-colored bruises and contusions on his neck and arms.
Dr. Israel J. Bernstein, to whom defendant was immediately taken upon release from custody on Friday, April 18, 1958, and who apparently had no previous connection with defendant except for having once treated his sister, gave the following testimony:
"This man showed many areas of bruising over the body, and I have them listed descriptively. He showed a small lump on the left forehead which was tender and was about the size of a plum but was flat. He showed a large bruised area which was yellowish purple in color from behind the right ear lobe extending four inches downward. He had a bruise of the left shoulder which was yellow and was over the whole shoulder and extended down to the armpit in front and extended over to the collarbone above here and the shoulder blade behind and inside this area, bruised area, he showed reddish bruised areas the size of fingertips and also several yellowish bruised areas.
He had a bruised area, also several yellowish bruised areas on the left shoulder above the posterior armpit * * *. He also showed several yellowish bruised areas over the left shoulder above the posterior armpit. * * * He also showed a laceration of the left wrist toward the thumb side about a half inch inside and he also showed a small contusion on the other side. He had many yellow bruises on the left arm, about six of them, one to two inches in size.
Now, on the right shoulder he also showed a large bruised yellow area of a lesser extent than the left, but it showed discreet (sic?) definite areas of redness and a yellowish area near the right armpit with a reddish center. He also showed two bruised areas of the right arm about two and a half inches by one inch and they were linear, long in shape, and also another area two inches long just above these I described.
He also showed a large area which was faintly yellowish below the right collarbone or clavicle inside the right arm above the *354 nipple and he also showed a tender seventh rib * * * and he showed a large bruise on the right leg above the right patella or kneecap."
The doctor, whose qualifications and integrity have never been challenged, dated these injuries as being between three and four days old, at the most a week, and was of the opinion that they were traumatic in origin.
Finally, the photographer, Morrone, who apparently also has no connection with defendant except for the one professional visit, testified that while he had no specific independent recollection of the condition of Bowden's body, he did recall that he was more badly bruised than the photographs indicated, explaining that the marks "were very difficult to see" on the prints. "You could see something but you could never bring it out in the photograph but there had been something."
The photographs unmistakably show the leg bruise and bruises of both shoulders and the right arm. There are other shadowy areas, but it is difficult to determine whether or not they represent bruised areas. Defendant is fully clothed in the police photographs with only his face and neck exposed, and nothing untoward appears thereon.
Bowden's contentions of physical abuse were denied by all the investigating detectives, Hull, Heiss, Nisivoccia, Kinney, King and Lissenden, who adamantly insisted that they had never used any threats, promises or physical violence to get the confessions and testified that never, during the entire period, did they see any marks of physical abuse on Bowden's body. Their claims are corroborated by the police officials who photographed defendant at various times after his arrest, the police officers who notarized the statements, an F.B.I. agent who saw Bowden on Tuesday and Wednesday, an employee of the Essex County Sheriff to whom custody of Bowden was turned over on Thursday, and the police officer in whose presence he talked with his father Wednesday morning. All were firm that Bowden neither showed physical evidence of abuse nor made any *355 complaints thereof. The only State's witness who lent any support to the physical abuse claims was Dr. Duffy, the county physician, who reported the total results of his examination of Bowden on Friday, April 18, as follows:
"* * * [A]pproximately five inches above the knee there was an ecchymotic discoloration which was old, about three inches in diameter. On the left shoulder there was evidence of a fairly recent contusion two inches in diameter * * * with ecchymosis and to a much lesser extent in the right arm."
Dr. Duffy opined that the "old" injury was inflicted about a week prior to his examination, the "recent" ones, about 30 to 70 hours prior; the latter thus occurring within the period of custody by the Newark police, the former, according to the doctor's estimate, one day prior to custody. The doctor was of the view that the injuries he saw were inflicted by external force.
The trial judge ruled that Bowden's confession was voluntary, finding that the issue as to its coercion "rests solely upon the question of veracity," and then going on to say that he could not believe defendant or his family. He declared that the father's story, especially, was fantastic, since, as a policeman, it should have been his "first reaction" to report having seen the hoses and observed his son's condition to the proper authorities. He also found it incredible that the hoses had been left in the small room during the family interview and said that if defendant had really been beaten it was unlikely his family would have been allowed to see him at all. The court also seemed to feel that 13 hours of interrogation spread over four days was an insufficient time to support the conclusion of police brutality. The photographs taken by Morrone were apparently ignored, and Dr. Bernstein's testimony was dismissed on the ground that he had certainly found some "old" bruises and that his findings of head injuries were much less extensive than those testified to by the mother and sister. Query as to why this discrepancy should cast doubt on the doctor's veracity rather than on that of the *356 obviously interested women. The doctor's reference to "old" bruises was patently intended as within the context of a finding that all the injuries had occurred within a week.
There is little doubt that there was some exaggeration both of the extent of the physical abuse and the symptoms thereof by defendant and his family. Nevertheless, the testimony of the two doctors, that of Dr. Bernstein filling in details of a broad outline reflected by that of Dr. Duffy, the testimony of the photographer and the two photographs taken by him, taken in composite, bear unmistakable witness to the fact that injuries of the general type complained of were inflicted on this defendant during the time of his custody with the Newark police. The State's suggested hypothesis that the bruises were self-inflicted is highly improbable, especially in the light of the police testimony that defendant's body showed no mark of abuse. As to the silence of the father, which so impressed the trial court as a token of incredibility, it seems at least equally explainable as the result of the father's compromised and awkward position as a rank and file patrolman. The presence of the hoses in the small room, a fact made much of by the court, could well have been the result of police carelessness or inadvertence. Perhaps that aspect of the story was fabricated. But at any rate, if there was appreciable physical abuse of defendant, it is, of course, irrelevant that he and his family may have exaggerated its extent so long as it remains logically inferable that the confession was the result of such abuse. Such inference we find here compelled by a substantial preponderance of the evidence. Also generally supportive of defendant's position is the four-day delay in his arraignment, a factor held to demand most careful scrutiny of the confession, although not per se sufficient to vitiate it. State v. Pierce, 4 N.J. 252, 265 (1950); State v. Wise, 19 N.J. 59, 84 (1955); State v. Smith and Stanford, supra (32 N.J., at p. 545).
While the number of New Jersey affirmances of trial court rulings on admissibility where claims of police brutality *357 have been urged might indicate an appellate reluctance to reverse such determinations, it must be noted that in none of those cases was there corroborative disinterested testimony or objective evidence. In contrast to this case (insofar as concerns Bowden), the issue generally resolves itself into one purely of credibility. See, e.g., State v. Wise, supra; State v. Walker, supra; State v. Bunk, 4 N.J. 461, 469 (1950), cert. denied 340 U.S. 839, 71 S.Ct. 25, 95 L.Ed. 615 (1950); State v. Cleveland, 6 N.J. 316, 326 (1951); State v. Cole, 136 N.J.L. 606, 611 (E. & A. 1948). In the one case in which there was disinterested corroboration, consisting of the testimony of a county physician and a jail warden, the court had no difficulty in finding, despite the vigorous denials of the police, that "[b]y a marked preponderance of the evidence, it [the confession] was clearly the product of unlawful physical applications which destroyed any semblance of its being voluntary within our decisions requiring a confession to be `an expression of free choice.'" State v Petrolia, 21 N.J. 453, 459 (1956). That court further noted that in the light of "persuasive physical evidence of bruises, contusions and injuries inflicted upon the defendant while in the custody of the police, * * * the denial by the police, in accord with the common pattern, under these circumstances gave little comfort to the State's position." Ibid. As noted above, there is clearly such a marked preponderance here. Bowden's confession should have been excluded, and we so hold.
We cannot agree that the admission of the confession may be considered "harmless" because of other strong and persuasive evidence of guilt, see State v. Petrolia, supra, at p. 460, observing also that "[a] confession induced by physical compulsion has no evidential value and should not be recognized in a civilized system of justice." See also Blackburn v. Alabama, 361 U.S. 199, 80 S.Ct. 274, 280, 4 L.Ed. 242, 248 (1960), wherein the United States Supreme Court said:
*358 "As important as it is that persons who have committed crimes be convicted, there are considerations which transcend the question of guilt or innocence. Thus, in cases involving involuntary confessions this Court enforces the strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will. * * *
But neither the likelihood that the confession is untrue nor the preservation of the individual's freedom of will is the sole interest at stake. As we said just last term, `The abhorrence of society to the use of involuntary confessions ... also turns on the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves.' Spano v. People of State of New York [360 U.S. 315, 320, 321, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959)] * * *. Thus a complex of values underlies the stricture against use by the state of confessions which, by way of convenient shorthand, this Court terms involuntary * * *."
Note, too, the admonition of Mr. Justice Hall in State v. Smith and Stanford, supra (32 N.J., at p. 544):
"We must ever be alert, however, that recognition is not mere lip service. Review [of rulings on confessions] has to be both wide and penetrating to make sure these constitutional rights have not been trampled upon."
As to defendant Duffy, there is no disinterested corrobative evidence to support his story of police brutality. Duffy was originally picked up by the F.B.I. on Saturday, April 12, 1958, the day after the holdup. He was questioned by them and released. He was picked up again during the evening of the following Monday, and the Newark police were apparently informed that he would again be released since they were waiting to arrest him as he left the F.B.I. office. From the time the Newark police took him into custody, 7:30 P.M., until 10:30 that night, Duffy was interrogated by Heiss and Nisivoccia. Tuesday morning at 9:00 A.M. he was brought into the small room and questioned by Detectives Heiss, Nisivoccia, Hull, Kinney, Lissenden and King. Bowden was brought in a half an hour later *359 and both were questioned together for about 20 minutes. Duffy was then returned to his cell and brought back for questioning by King and Lissenden at 11:00 A.M. Shortly before Bowden's return from his Upsala trip, Duffy began to give his statement, which was completed at about 3:00 P.M. He was placed in various line-ups and returned to his cell at about 5:30 P.M. He was arraigned with Bowden the next day and removed to the Newark Street jail that afternoon. He was examined by the sheriff the following Saturday, April 19, and by Dr. Duffy April 21.
Duffy testified that at his first interrogation Monday night he was threatened and beaten by Nisivoccia and Heiss and also promised probation by them if he would confess. He said he was threatened by King and Lissenden on Tuesday, Lissenden kicked him, and that the latter threatened to lock up his wife, then seven months pregnant, as a material witness, and put his small children in a home. His main physical complaint was being kicked in the back in the kidney area. In fact, his wife, upon request from the police, did bring him a suspensory belt while he was in their custody. He claims the belt was brought because he told his wife his back hurt, but that he had never used such a device since childhood, and the belt brought to him did not belong to him but was his father's. His wife corroborated this story, but the trial court disbelieved them both, finding that Duffy had a pre-existing back condition. There was no objective evidence of any back injury, according to the testimony of Dr. Duffy and of two doctors from Martland Medical Center where defendant had been sent by Dr. Duffy for examination and X-ray. Neither doctor found any discoloration or external evidence of abuse on defendant's back. As to evidence of other bruises, Dr. Duffy denied having found any. The police also denied inflicting any blows as well as the various threats and promises testified to by the defendant. Duffy's mother testified that when she first saw him, which was the Saturday after his arrest, in the Newark Street jail, "he could hardly come down the stairs." His *360 wife testified to running her hand around his head and feeling lumps on it. Bowden's father also testified that Duffy was present in the small room after the arraignment when he saw his son with his wife and daughter-in-law and that at that time he felt Duffy's head and observed lumps on it.
In respect of Duffy, consequently, the issue as to the voluntariness of his confession, there being absent any corroboration by objective or disinterested evidence, resolves itself into a question of credibility. True, Duffy was confined in jail, not being able to procure bail, long after Bowden was, and hence had no opportunity to establish such objective evidence. Nevertheless, the fact that Bowden was able to do so and that because of that evidence was able to present a preponderance of credible proofs in his favor cannot help Duffy. Assuming, as we have found, that Bowden was beaten, this cannot, of itself, found an inference that Duffy was beaten, too. First, the testimony of Dr. Duffy, which was supportive of Bowden's claim, completely negates Duffy's. Furthermore, the facts concerning their respective confinements are different. Duffy was held only one night and part of a day before his confession; Bowden was held one night plus two full days before his. Finally, even though the police used physical force on Bowden, they might not have found such force necessary with Duffy, possibly a more cooperative defendant. In fact, the police having gotten a confession from Bowden, it is probable that Duffy's confession was induced by his confrontation with Bowden's.
There is not a marked preponderance of evidence in favor of the hypothesis of Duffy's confession having been obtained by coercion. We consequently affirm the ruling of the trial court on its admissibility.

III.
After completion of the testimony on the collateral attacks on the confessions of both defendants the jury was excused, and argument by counsel and rulings by the court were *361 made out of its presence. During the course of its ruling on the voluntariness of the confessions the court declared, in rather vigorous language, that it did not believe the stories of either of the defendants or of their families. A reporter was apparently present in the courtroom, and the next morning an article appeared in the Newark Star-Ledger, headlined "Judge accuses cop of lying about police brutality to son." The story, fairly accurate, quoted the trial judge as saying that the testimony of Bowden's father was "fantastic"; "I do not believe him"; "I am not being fooled by it"; and that "I have observed the defendants here in court. They are not telling the truth when they claim the detectives inflicted such serious and savage beatings." At the beginning of the day's session, the court, upon request by the defense, polled the jurors, and eight of them admitted having read the article. They said, however, upon inquiry, that they would not be affected by it in their determination of the case. For this reason the court denied the defense motions on behalf of each defendant for a mistrial. This action is assigned as error on this appeal. Since Bowden must be retried because of the inadmissibility of his confession, the issue is academic as to him. In Duffy's case, however, the question of error is crucial.
The issue is whether the reading by eight of the jurors of the newspaper report of the remarks of the judge on his ruling as to the admissibility of the confessions was so prejudicial to the defendants as to have required a mistrial.
Under the rule concerning the allocation of functions between the judge and jury where the voluntariness of the confession is in issue, just enunciated by the majority of the Supreme Court in a separate concurring opinion in State v. Smith and Stanford, supra, the judicial determination of admissibility does not preclude a subsequent jury finding that the confessions were nevertheless involuntary. Obviously, then, the jury's impression as to the credibility of the witnesses on the collateral attack must be regarded as one of the crucial factors in its ultimate finding. Even under the *362 more traditional concept of the minority of the court in Smith and Stanford  that applied by the trial judge here in his charge to the jury  that the jury should consider the evidence touching the voluntariness of the confessions in determining what weight to give them, the jury's deliberations as to the credibility of the witnesses on the collateral attack were presumptively material to their conclusions on the case as a whole.
Clearly, had the remarks quoted in the newspaper article been made by the court in the presence of the jury, there would be little, if any, doubt that they would have effectively precluded the independent jury determination on credibility to which defendants were entitled. As noted in State v. Corbo, 32 N.J. 273 (1960), where there was a reversal because of prejudicial comments by a trial judge as to the credibility of a witness, even though curative instructions had been given, "Jurors quite naturally are swayed by a judge's views, for the judge is a figure of objectivity and impartiality." Thus, while the trial court is given a wide discretion in commenting upon the evidence, a proper exercise of that discretion must fall short of stating its own outright conclusions as to the credibility of particular witnesses, most especially of the defendant himself. See State v. Riley, 49 N.J. Super. 570, 581-2 (App. Div. 1958), reversed in part on other grounds, 28 N.J. 188 (1958); State v. Terry, 89 N.J.L. 522, 525 (Sup. Ct. 1916). This consideration gains added weight here in the light of the unanimous view of the Supreme Court, as expressed in the Smith and Stanford case, that the jury should not be told that the trial court has, on the collateral attack, found the confession voluntary (32 N.J., at p. 549).
That the remarks appeared in a newspaper story read by the jurors rather than having been orally made to them by the court cannot affect the application here of the principle under consideration. The accuracy of the article was never denied. The situation here is distinguishable from such cases as State v. Curcio, 23 N.J. 521, 527-528 (1957); *363 State v. Cottone, supra (52 N.J. Super., at p. 327); and State v. Petrucelli, 37 N.J. Super. 1, 8 (App. Div. 1955), where there was no evidence that the jurors had read the allegedly damaging newspaper accounts.
We are constrained to conclude that with the revelation that eight of the jurors had read the newspaper account of the judge's remarks attendant upon his ruling, a fair conclusion of the trial from the standpoint of the defendants became impossible and there was consequently error in denying a mistrial.

IV.
Miscellaneous other asserted trial errors are argued by defendants, but since a new trial must result from the determinations already announced herein, we shall not discuss them at any length.
Defendants complain of the alleged prejudicially extensive interrogation of defense witnesses by the court. A reading of the full transcript indicates that there was not even arguably excessive questioning of that nature until after the collateral attack on the confessions was completed and their admissibility ruled on. During that phase of the case the trial judge was punctiliously careful to protect the rights of the defendants. There was, however, an appreciable degree of questioning thereafter by the court of Bowden's alibi witnesses. As noted in State v. Riley, supra (49 N.J. Super., at p. 581), the trial judge may properly participate in the examination of witnesses "to discover the truth when, in his opinion, the witness has not testified with entire frankness." There can be no doubt that this was the court's sole purpose and that its opinion as to the sincerity of the witnesses was justified on what was before it. The questioning, viewed in full context, did not go beyond this function and was not unduly prejudicial.
Duffy complains of various errors in connection with the testimony of one Kennedy, one of the four young men *364 who had observed the getaway car (not the one who saw the license number). Kennedy had given a statement to the police concerning only the make, model and color of the vehicle. On the witness stand he claimed to have given that statement, which he repudiated as untrue, because Detective Heiss threatened him with a gun. This testimony concerning police coercion was given out of the hearing of the jury, and defendant claims that he was prejudiced by the court's ruling that the transcript thereof could not be read to the jury. The court, however, did give defense counsel the right to re-examine Kennedy on this issue in the jury's presence, and counsel chose to waive it. Under these circumstances, there cannot be said to have been any denial of defendant's rights. See State v. Genese, 102 N.J.L. 134, 139 (E. & A. 1925). Duffy also complains of a newspaper article reporting the court's statement, made out of the presence of the jury, that Kennedy had been guilty of false swearing. Suffice it to say that a repetition of such an incident need not be anticipated on the new trial.
The final attack by Duffy is on his sentence, his claim being that the court improperly bargained with him, promising a more lenient sentence if he would confess. This characterization of the court's remarks is not wholly accurate. Furthermore, the sentence which was imposed was less than the statutory maximum and cannot be said to have been improper in the light of the circumstances appropriate for consideration in fixing sentence. In any event, should there be a conviction at the retrial, there will be a new sentence.
Reversed and remanded for a new trial as to both defendants.