[Civ. No. 14185.   Second Dist., Div. Three.   Sept. 14, 1944.]

MARGARET C. WHITTEMORE et al., Respondents, v. LOCKHEED AIRCRAFT CORPORATION (a Corporation), Appellant.

738

Joe Crider, Jr., and Frank B. Belcher for Appellant.

Kenneth E. Grant and J. Edward Haley for Respondents.

BISHOP, J. pro tem.—At 1:40 p. m. on the sixteenth day of May, 1938, an airplane, which had just been completed

by the defendant, Lockheed Aircraft Corporation, tested and found wanting in no detail, took off from the Union Air Terminal at Burbank on a flight to Las Vegas, Nevada, where it was to be delivered to the Northwest Air Lines, Inc. In the seats provided for the pilot and co-pilot in this dual control ship, sat Fred W. Whittemore, a licensed pilot with more than ten thousand hours of flying experience and the operations manager of the plane's purchaser, and Sid Willey, one of the defendant's skilled pilots. The plane also carried Mr. Salsbury, who had been serving as the Northwest Air Lines' resident engineer during the construction of the plane, and six other persons, with their 150 pounds of baggage; not a capacity load. Twenty-five minutes after its take-off the plane, shrouded in fog, circled and then crashed into a mountainside, taking the lives of all on board.

This action was brought by the widow of Mr. Whittemore to recover from the defendant company the damages she suffered by reason of the death of her husband. The theory of her complaint was that her husband's death had been caused by the negligence of the defendant; she did not and does not contend that anyone was intoxicated or guilty of wilful misconduct. If Mr. Whittemore was a noncompensating guest, therefore, the plaintiff has no cause of action against the defendant. (California Air Navigation Act, § 11½, Stats. 1929, p. 1874, as amended; Deering's Gen. Laws, 1937, Act. 151.) Upon the first trial of this action the trial court, convinced that as a matter of law Mr. Whittemore was a noncompensating guest, granted a nonsuit. This judgment was reversed on appeal by this court (*Whittemore* v. *Lockheed Aircraft Corp.* (1942), 51 Cal.App.2d 605 [125 P.2d 531]), and the action was retried, resulting in a verdict and judgment for $25,000.

Defendant's appeal from this judgment is based, in part, upon the giving of an instruction which represents a complete swing of the pendulum from the trial court's position on the first trial, an instruction, given at plaintiff's request, which declared "on the flight of defendant's plane from Burbank, California, to Las Vegas, Nevada, the decedent Fred W. Whittemore was in law a passenger, and the defendant therefore owed him the duty of ordinary care and diligence for his safe carriage." It was error, we have con-

cluded, to give this instruction, and for this error, and others, this judgment also is to be reversed.

It was error to give the quoted instruction for several reasons. In the first place, had the evidence permitted of but one conclusion, that being that Whittemore was a passenger, that is, a paying guest, there would have been no need to instruct the jury further than to advise it that the measure of defendant's duty was that of ordinary care, for the only importance of Whittemore's status was to determine the degree of care required of the defendant. But the evidence permitted of more than one conclusion; the question was one that should have been left to the jury as one of fact. We do not agree with the defendant's contention that the conclusion expressed in the preceding sentence was established as the law of the case on the former appeal. This court, in its first review of this case, held that the evidence warranted the jury in concluding that Whittemore was a passenger, "meaning one," care was taken to state, "who is not a nonpaying guest and who is not engaged in a joint enterprise." It was not necessary to the decision, and it was not declared, that there was or was not evidence which would have supported the contrary conclusion, that is, that Whittemore was a noncompensating guest. On this appeal we find that the evidence would justify that contrary conclusion.

█ It should be borne in mind, as we now consider the evidence in reviewing, not a nonsuit, but an instruction advising the jury that Whittemore "was in law a passenger," that the burden was upon the plaintiff to prove that Whittemore was *not* a "guest riding in . . . [the] aircraft without giving compensation for such ride or . . . while engaged in a joint enterprise with the airman flying the same" (quoting from section 11½, California Air Navigation Act, which appears in full in our previous opinion). This was stated to be the rule on the former appeal (p. 609 of 51 Cal.App.2d and p. 533 of 125 P.2d), and is in harmony with the cases announcing the rule under the like provisions of the automobile guest statute. (*Kruzie* v. *Sanders* (1943), 23 Cal.2d 237, 240, 241 [143 P.2d 704, 705]; *Jenkins* v. *National Paint & Varnish Co.* (1936), 17 Cal.App.2d 161, 163, 164 [61 P.2d 780, 781].) █ If, therefore, it appears that the jury could, with reason, have concluded that it was not persuaded by the evidence either that compensation had been given

to the defendant for Whittemore's ride on the fatal trip, or that he was not engaged in a joint enterprise with the defendant, a verdict in defendant's favor would have been warranted, and it was, consequently, error to take the issue from the jury. It is our duty, as we test the propriety of the trial court's action, to weigh the evidence, resolving conflicts in favor of the defendant, and in so doing we are preserving, not usurping, the function of the jury.

Insofar as the evidence at the second trial, on this question of the compensation for Whittemore's ride, was a repetition of that given at the first trial and set out on the former appeal, it need not again be detailed by us. In its essence, the evidence at the two trials was the same. The plaintiff points out that at the second trial no one testified, as had been stated at the first, that Whittemore had paid no compensation for the ride. But neither did any witness testify that he had, and silence on an issue as to which the plaintiff has the burden does not help her cause. It is true that at the second trial the history of the previous business dealings between Whittemore's company and the defendant was gone into in more detail. It now is known that the defendant had been engaged since 1934 in making planes for Whittemore's company; the defendant considered it a valued customer; it hoped to continue to do business with it. Defendant's president was quite plainly testifying in part from hearsay and not altogether from his own knowledge, but he testified that some, if not all, of the planes sold to the Northwest Air Lines were delivered at Las Vegas; that in most cases, but not always, Whittemore was the representative of the purchasing company who came west to take delivery; and that when he was the representative, he would usually come to the plant at Burbank and fly to Las Vegas on the delivery flight. Whittemore was a frequent visitor at the defendant's plant. Another officer of the company testified much to the same effect. There seems no reason to doubt that, as on most of the previous occasions, so on the last, the agreement of the parties was that the plane was to be delivered to the company which Whittemore represented at Las Vegas, even though the written contract was silent on the subject. As was developed on the former appeal, the evidence before the jury warranted several inferences that met the stated requirement that

''[w]here the claimed compensation consists only of some business advantage or benefit which will accrue to the operator, in order to take one out of the guest class, it must be of a practical and tangible nature identified definitely with the business purposes of the operator of the vehicle.'' .(51 Cal. App.2d 605, 609 [125 P.2d 531, 533].) The more complete history of the previous business dealings between the parties gave a more complete understanding of the latest deal, but it added nothing essentially new to it. Even now, all that can be said of the evidence is that it furnished a foundation sufficient for the drawing of the inferences to which attention was called on the former appeal.

But this was not enough to justify taking the issue from the jury. The evidence did not lead inescapably to the conclusion that the defendant received a benefit of a tangible nature as a consideration for giving Whittemore a ride. Not to recognize this as true is to take the untenable position that a person may not give a ride to one, with whom he has or hopes to do business, except as a paying guest. The jury might well have reasoned that there were too many faint or absent lines in the picture of ''compensation'' which plaintiff had endeavored to draw for them. Whittemore, it appeared, was in the office of the defendant's president at 10 or 11 o'clock of the morning of May 16th, but no business was transacted between them. This was understandable, for with the delivery of the plane that was then being readied for flight, the last existing contract between the defendant and Whittemore's concern would be completed. As plaintiff stated in her brief: ''every particle of evidence on the issue of whether Whittemore was a passenger or a guest on the plane was adduced through the officers of Lockheed, examined under Section 2055, C. C. P.'' The officers testified that they understood that Whittemore was going to be one of those going with the plane to Las Vegas, there to receive it on behalf of the purchaser, but there was no word or writing that revealed what was in Whittemore's mind to cause him to board the plane at Burbank. That is to say, no witness reported any correspondence or conversation with Whittemore which shed light upon any arrangement he had made with the defendant whereby he gained permission to accompany the plane, or which explained why it was that he came to Burbank, instead of meeting the plane at Las Vegas. The

company's engineer, Salsbury, was a passenger—an occupant—of the plane; he could have received it for the company. The motivating reason for Whittemore's presence may have been entirely personal, having no relation to defendant's interests, although not inimical to them. Therefore we say: had the question been left to the jurors they might, but they might not, have drawn the inference that for Whittemore's ride the defendant received compensation. In this connection we find these words from *Blank* v. *Coffin* (1942), 20 Cal.2d 457, 460, 461 [126 P.2d 868, 870], most appropriate: "It is not always possible for a party to a lawsuit to introduce evidence directly bearing upon the existence of a fact that he is attempting to prove. The evidence available to him may serve only to establish the existence of certain primary facts that are logically connected with the material fact. If a jury can reasonably infer from these primary facts that the material fact exists, the party has introduced sufficient evidence to entitle him to have the jury decide the issue. The jury is not compelled to draw the inference, however, even in the absence of contrary evidence and may refuse to do so. Whether a particular inference can be drawn from certain evidence is a question of law, but whether the inference shall be drawn, in any given case, is a question of fact for the jury."

Not only was it error to instruct the jury that "Fred W. Whittemore was in law a passenger" for the reason that the issue involved was one of fact, not law, but for the added reason that the wording of the instruction naturally would and actually did confuse the jury. In legal literature the words "guest" and "passenger" have acquired connotations of which jurors, almost without exception laymen, are quite unconscious. The statute itself does not differentiate between "passengers" and "guests" but refers to a "guest" who rides "without giving compensation for such ride." It does not appear that the jurors in this case were aware that there was any question as to whether Whittemore was a "passenger" as distinguished from a "guest." Nothing occurred during the course of the trial that would bring such an issue to focus, and in view of the fact that the trial judge advised counsel before argument that he was going to take the question from the jury, it is not to be assumed that it was dis-

cussed in argument. But it does clearly appear that one of the important questions of the case was whether Whittemore was a "passenger" as distinguished from the "pilot" flying the plane. Much of the evidence was addressed to this question, and pointing to it were many objections, followed by huddles at the bench and consequent rulings. That it was regarded by the jurors as an important issue is evidenced by a question asked upon the occasion of their first return to the courtroom after their deliberations had progressed to a point, or points, of confusion. The foreman had requested further light on "negligence" and "contributory negligence," and then another juror inquired of the court: "In your instructions did you state Mr. Whittemore was a passenger or a passenger pilot?" By way of reply the instruction we have been considering was reread to the jurors. Then followed a lengthy discussion in chambers, in turn followed by a return to the courtroom and a rereading of an instruction which outlined to the jury the order in which they should consider the problems of the defendant's negligence, its proximate effect, Whittemore's negligence, its contributory effect, and the question of damages. Then this colloquy took place between the juror who had previously inquired concerning the subject, the trial judge, and counsel: "JUROR NUMBER 6: Your Honor please, was his status established? That seems to be our worry. MR. CRIDER: That depends upon what he means by 'established.' THE COURT: I don't understand what you mean by 'established.' THE JUROR: In your instructions at first you said he was a passenger. You have affirmed and denied that since then. Does he still remain a passenger? THE COURT: Yes. MR. CRIDER: That doesn't determine the question, even though he was a passenger, as to who was driving the plane. MR. GRANT: I object to the argument of counsel. THE COURT: Objection sustained. I don't think you should have any argument. It is for the jury to determine, it is their exclusive province to determine the facts in the case, consider and weigh the evidence for that purpose. Of course, it is the duty of the court to instruct you on the law. Any other question? All right, the jury may retire for further deliberation."

Some hours later the jury again appeared in the courtroom, announced that they had stood seven to five on every

ballot, and, upon invitation, an unidentified juror stated: "Your Honor, there still was controversy on the point of what was considered contributory negligence and negligence. That is still being thrashed out. Also a passenger in the plane." Another discussion between court and counsel occurred in chambers, during which two new instructions, defendant's instruction No. X and then plaintiff's instruction No. XX, were written out in longhand. Once again in the courtroom the trial judge reread some instructions defining negligence and contributory negligence; again, as plaintiff's counsel had repeatedly requested him to do during the conference, he read the instruction which we have quoted, with its statement "Mr. Whittemore was in law a passenger"; and he then concluded with the two new instructions. The first one, being defendant's instruction No. X, reads: "You are instructed that it is a question of fact for you to determine who was actually piloting and flying the plane at the time of the accident and at the time the plane left the ground at Burbank," the second, plaintiff's instruction No. XX, declared: "If you find from the evidence that the decedent Fred W. Whittemore was actually operating the plane at the time of the crash you are instructed that he was not by reason thereof guilty of contributory negligence unless you further find that some negligence on his part in such operation of the plane as distinguished from the general management, direction and control thereof proximately contributed to the accident and to his death."

It cannot be said with any certainty that the confusion plainly caused in the jurors' thinking by the instruction that Whittemore was in law a passenger was ended by the belated instruction telling them that whether or not he was actually flying the plane was a question for them to answer. But if defendant's instruction No. X did have the effect of curing their confusion on the one point, plaintiff's accompanying instruction No. XX robbed the cure of its virtue, for it erroneously limited the significance of Whittemore's flying of the plane so as to deprive defendant of much of the value of its plea of contributory negligence.

There was no occasion to touch on this phase of the case, upon the former appeal, and it will be better understood if a background is sketched of the facts which the jury may have

drawn from the evidence which was, in the main, without conflict. The defendant company had originally assigned pilot Downes to fly the plane from Burbank to Las Vegas. Somewhere between 7:30 and 8:00 a. m. on the day of the fatal flight, Downes inquired about the weather at the United States Weather Bureau, located in the Union Air Terminal at Burbank, and was told that contact flying through the Mint Canyon section to Las Vegas was not possible, at the time, and probably would not be possible during the day. (Contact flying, the jury was informed, is flying in which the pilot is enabled to keep to his course by keeping the earth's surface in view.) Around 11:00 or 11:30, of the same morning, Downes, for personal reasons, was relieved of his assignment and Willey was substituted as defendant's pilot in charge of the delivery flight. Willey, incidentally, was licensed to do instrument flying and the plane was equipped for it. At 1:20 p. m. Willey telephoned his flight plan to the manager of the airport traffic control tower. In it he stated his destination, identified his plane and furnished other required data, and added: "Flying contact to Palmdale." Whittemore, it was stipulated, was familiar with this flight plan. He was also familiar with the terrain over which the flight was to be made, for, as we have seen, on several, possibly many, previous occasions he had been on the plane on its delivery flight to Las Vegas. He and Willey were in a group near the plane, just before or just after the flight plan had been given, and he was heard to say to Willey: "Let us go up and check the weather." Thereupon the two went up to the building where the weather bureau was located, returned shortly, and got into the plane. Willey first occupied the left-hand seat in the cockpit, but relinquished it to Whittemore after the latter arrived and spoke to him. Whittemore then slid the window open, signalled with his arm and received an answering signal indicating that all was clear so that the engines might be started. He then started the engines, let them idle a minute or so, put his head out of the window, looked forward and back, signalled to a member of the ground crew, and finally, a return signal having been given, the plane taxied to the runway, and took off.

This evidence gave the jury a basis for concluding that Whittemore was at the controls when the plane took off on its fatal flight, and was still flying the plane when it crashed,

less than a half hour later. Willey, to be sure, was and remained the defendant's agent, in charge of the plane and of the flight, so far as the defendant was concerned. But we are not now considering the possible failure of the defendant to discharge the duty it owed to Whittemore, but Whittemore's failure to exercise that care for his own safety which it was his duty to exercise. It affirmatively appears that Willey had full authority, from his company, to permit Whittemore to fly the plane. No governmental regulation, to which our attention has been called or of which we are aware, forbade it. There was nothing in the evidence, then, to prevent the jurors from concluding, and they might well have concluded, that Whittemore, of his own volition, was the actual pilot to fly the plane off the field and up Mint Canyon. If the defendant was negligent because Willey, with weather information much later than that received by Downes early in the morning, did not act as an ordinarily prudent person would have acted, because he permitted the plane to take off and continue on a contact flight in the face of the known low to vanishing visibility, Whittemore was equally negligent, the jury could have reasoned, in taking the plane off and continuing on the flight.

It is no answer to our observations to say: But the jurors returned a verdict in plaintiff's favor. It is more than likely that this result was the direct consequence of the last instruction they received, plaintiff's instruction No. XX. It was error to give this instruction. Defendant contends that it was "confusing, meaningless, and inapplicable to the facts of the case." We think that this is an unduly harsh criticism. The instruction has a meaning which is in harmony with statements plaintiff has made at one time or another. The antithesis in the instruction is not new. In plaintiff's brief we find: "On this appeal whether Whittemore flew the plane or whether Willey flew it is entirely immaterial, for the record discloses no evidence whatsoever of negligence in the mechanical act of flying the plane." Where, then, is there any negligence on anybody's part? Plaintiff give an answer to this question in two places: In her brief with emphasis she says: "The proximate cause of the accident here involved was the negligence of Lockheed *in the general management, direction and control* of the delivery flight." This theory of de-

fendant's negligence appeared earlier in the case, in plaintiff's amendment to her amended complaint, where she alleged that the defendant "so carelessly and negligently constructed, maintained, cared for, directed, managed and controlled its said transport plane that . . . while defendant was flying it to its destination at Las Vegas, Nevada, said airplane crashed to the earth." The evidence, we may note here, utterly failed to substantiate the contention that the defendant was in anywise negligent in the constructions, maintenance or care of the plane, and this the plaintiff now admits. The only negligence of which the defendant could have been found guilty was that generally described as having to do with the direction, management and control of its plane, and specifically described, in further averments in the amendment to the amended complaint, as having the plane take off on a contact flight and continue on such flight, in the face of information that weather conditions did not permit of contact flying.

The effect of plaintiff's instruction No. XX, therefore, was to advise the jurors that if they were to find Whittemore guilty of contributory negligence at all it must be in the operation of the plane as distinguished from the negligence charged against the defendant. In other words, any negligent conduct, on his part, was limited to the manner in which he operated the plane, even though the jury should believe that he decided to operate it under conditions which made its operation at all a venture which a careful person would not undertake. Whittemore and Willey, the jurors could have said, had substantially equal knowledge that they ran a grave risk making a contact flight to Las Vegas, no matter how carefully the plane was operated. They could have concluded that Willey, who was the defendant itself, the evidence plainly revealed, so far as the responsibility for the flight was concerned, was guilty of negligence in undertaking it, as distinguished from negligence in the operation of the plane. How then can it be stated that Whittemore's negligence, if any, was limited to the operation of the plane? He participated, acquiesced, in the decision and subsequent action which constituted, the jury might well have said, the only negligence of which Willey and so the defendant were guilty.

We do not wish to be understood as saying that the plaintiff now contends that Whittemore's only possible negligence con-

sisted in the operation of the plane. She states, properly (*Connor* v. *Johnson* (1933), 132 Cal.App. 449, 453 [22 P.2d 760]; *McMahon* v. *Schindler* (1940), 38 Cal.App.2d 642, 645 [102 P.2d 378]), that "Whittemore could of course have been guilty of contributory negligence in accompanying the flight or in any way participating in it under conditions which he knew . . . to be dangerous," "but," she continues by way of justifying her instruction No. XX "whether the plane took off and continued on a contact flight—whether under favorable or unfavorable conditions—was something over which Whittemore had no control whatever." There is evidence which indicates that the flight would not be made except at a time and so under conditions agreeable to Whittemore. But be that as it may, Whittemore was not shanghaied into making the trip; he flew the plane, the instruction presupposes, and, so far as the question of contributory negligence is concerned, did assume control over it. If what the instruction was drafted to declare was that Whittemore had not taken over the *defendant's* responsibility for the general management, direction and control of the plane, it failed to be serviceable for that purpose, was not called for by any evidence, and only served to confuse or mislead the jury.

It has become obvious that in support of defendant's charge that Whittemore's negligence was a contributing factor in the accident, any competent evidence tending to prove that Whittemore was flying the plane should have been received. Some evidence of this nature which was offered by the defendant was rejected. It will be recalled that Willey first seated himself in the cockpit on the left side, but gave up his seat to Whittemore. By questions, to which objections were sustained, and by offers of proof, which proved futile, the defendant endeavored to show the significance of this maneuver. It tried to prove that it was the general custom among flyers, "an absolutely universal, unwritten custom and unwritten law among pilots," for the pilot who was going to do the flying, in a dual control plane, to take the seat on the left-hand side of the cockpit. This evidence should have been received. A jury would be fully justified in concluding that the person, who was seated on the left-hand side of the front seat of an ordinary looking automobile moving along Highway 101, was doing the driving. A jury could with

reason have inferred, in the gay nineties, that the person, sitting on the right side of a "dual control," one-horsepowered buggy, was the driver. These inferences jurors could draw from their familiarity with the facts that, in the ordinary course of events, a modern car has a left-hand drive, and, in the old-fashioned buggy, the whip socket and the driver were customarily on the right-hand side. The only difference between these illustrations and the situation in this case is that in the latter the usual, to-be-expected, situation had to be established by expert testimony. Had the defendant been allowed and able to introduce the testimony it announced itself prepared to introduce, the jury could with reason have inferred that Whittemore, because he took the left-hand seat with Willey's acquiescence, was the pilot who was to control the flight of the plane, that is, to fly it, on its takeoff and until such time as a reason arose for a change over to the co-pilot.

Respecting the ruling we have been discussing, plaintiff states: "evidence of custom was in fact admitted, and prejudicial error cannot be assigned because the trial court prevented the same witness from repeating what he had already said." The witness referred to was Sanders. Sanders had testified that a pilot taking a plane off an airport has to pay particular attention to certain instruments, and that these instruments in the defendant's plane, whose panel was "more or less standard," were located on the left side of the instrument panel, but were plainly visible to both pilots. Then, in response to a question asking for the function of a pilot in taking an airplane from the ground, Sanders began: "Well, the pilot of the airplane usually gets in"—— when he was interrupted and asked to state to whom he referred as the pilot. He answered: "The captain who sits on the left-hand side of the ship." He related then the several steps whereby a ship was started. "The pilot who is commonly called pilot is the captain. He starts his engine, takes his place on the left-hand side, clears the ship by sight with the mechanics outside. As a rule, they wave him off that everything is okey. He gets permission from the control tower, taxies out to the end of the runway." Other details followed, ending in the plane's being in actual flight. Then, over plaintiff's objections, Sanders testified that there was, throughout the airplane industry and among pilots of planes, a cus-

tom as to the seat occupied by the pilot who takes the plane off the ground, which custom was observed on test flights as well as on others. However, when he was asked to state where, by custom, the chief pilot sat, plaintiff objected and her objection was sustained. This ruling led to considerable discussion and the offer of the defendant to prove not only by Sanders, who had had twenty-five years of flying, but also by four other pilots of long experience, what the custom was.

It cannot be fairly said, then, that the ruling complained of simply prevented Sanders from repeating what he had already said. It prevented Sanders from testifying that the idea that the one who sits in the left seat is the captain, was not just his idea nor a Lockheed procedure, but that it was a widely recognized trade custom. Moreover, it prevented the defendant from having the benefit of the testimony of four witnesses in addition to that of Sanders, who was one of its own employees. This is seen to be of importance when we note that the plaintiff put on a witness in rebuttal who testified that about 80 per cent of the time he flew a ship from the right-hand seat. The evidence offered by the defendant was relevant (see *Moody* v. *Peirano* (1906), 4 Cal.App. 411, 418 and 420 [88 P. 380]); it was prejudicial error not to receive it.

■ Evidence of a kindred nature was also offered and rejected. Defendant attempted to prove, first by proper questions and then by an offer of proof, that on four occasions, to wit, September 12, 1937, September 25, 1937, October 29, 1937, and December 28, 1937, Whittemore came to Burbank, when a plane was ready for delivery, and in each instance took the left-hand seat and flew the plane off the field and the entire way to Las Vegas, and that these were the only occasions, other than the one of May 16, 1938, when Whittemore came to Burbank in connection with a delivery flight. The plaintiff's objections to the questions and offer of proof were sustained. It is our opinion that the evidence should have been received.

Although defendant's proof of the existence of the custom, that the pilot who was to fly the plane sat in the left-hand seat, was not so strong but that prejudice was suffered in the rulings which prevented the defendant from strengthening it, it was sufficiently strong to enable the jury to conclude that

such a custom existed. This being so, the proffered evidence, that on all four occasions when Whittemore flew the plane he occupied the left-hand seat, should have been received because it tended to show that whenever the occasion arose, Whittemore conducted himself in harmony with, not in defiance of, the established practice.

The evidence should have been received for another reason. There were several eyewitnesses who testified that Whittemore took the left-hand seat, and one that, at the takeoff, he did the various things a pilot does who is operating a plane at the initial stages of its flight. As to these two matters, then, the evidence that Whittemore had always occupied the left hand seat and flown the plane off the ground, whenever he accompanied it, could not serve as a basis for an inference that on the fifth occasion he had done so. Whatever persuasiveness we may find in the statements expressed by the various text writers, from whose works quotations appear in *Wallis* v. *Southern Pacific Co.* (1921), 184 Cal. 662, 666, 667 [195 P. 408, 15 A.L.R. 117], we find the rule to be too settled in this state for us to debate it, that where there are eyewitnesses to an incident, evidence of habit respecting an act involved in the incident may not be received. (*Starr* v. *Los Angeles Ry. Corp.* (1921), 187 Cal. 270 [201 P. 599]; *People* v. *Crossan* (1927), 87 Cal.App. 5, 15 [261 P. 531]; *Blackford* v. *Beckworth* (1928), 90 Cal.App. 37, 40 [265 P. 514]; *Lindsey* v. *Pacific Electric Ry. Co.* (1931), 111 Cal. App. 482 [296 P. 131]; *White* v. *Shepardson* (1931), 116 Cal. App. 716, 719 [3 P.2d 346]; *Collins* v. *Hodgson* (1935), 5 Cal.App.2d 366, 373 [42 P.2d 700]; and see *Boone* v. *Bank of America* (1934), 220 Cal. 93, 95 [29 P.2d 409]. See, also, *Shearer* v. *Pacific Gas & Electric Co.* (1941), 43 Cal.App.2d 306 [110 P.2d 690], and *Kelley* v. *San Francisco* (1943), 58 Cal.App.2d 872 [137 P.2d 719], which, ignoring all but one of the cases which we find decisive, reach a conclusion out of harmony with them.) However, with respect to the question of who was operating the plane up Mint Canyon at that last moment when it could have been turned back from entering the enveloping fog bank, there was no eyewitness to testify which of the pilots was operating the plane. With the proof before the jury that Whittemore had, less than half an hour earlier, flown the plane off the ground, the fact that on every previous trip when he had done that, he had flown it all the way to Las Vegas, would tend to support the conclusion that

on the last flight it also was his intention to fly all the way to Las Vegas (note the *decision* in *Shearer* v. *Pacific Gas & Electric Co., supra,* 43 Cal.App.2d 309 [110 P.2d 690]).

Where the evidence is entirely circumstantial a party should not be deprived of competent, relevant evidence because it is not of great strength. Many threads may make a rope.

In the event of a retrial it is unlikely that the plaintiff will repeat her question about insurance, in the jury's presence, so we shall not dwell upon that incident. Nor do we find it necessary to consider other matters that have been brought to our attention. For the reasons already given, the judgment is reversed.

Desmond, P. J., and Shinn, J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied November 9, 1944. Curtis, J., and Carter, J., voted for a hearing.