Milton M. LEVIN, Appellant,

v.

UNITED STATES of America, Appellee.

No. 18024.

United States Court of Appeals District of Columbia Circuit.

Argued Dec. 16, 1963.

Decided June 30, 1964.

Certiorari Denied Feb. 1, 1965.

See 85 S.Ct. 719.

Bazelon, Chief Judge, dissented.

Mr. Frederick Bernays Wiener, Washington, D. C., for appellant.

Mr. Harry T. Alexander, Sp. Atty., Department of Justice, with whom Messrs. David C. Acheson, U. S. Atty., and Frank Q. Nebeker, Asst. U. S. Atty., were on the brief, for appellee.

Before BAZELON, Chief Judge, and WASHINGTON and BASTIAN, Circuit Judges.

BASTIAN, Circuit Judge.

Appellant was tried, convicted and sentenced for the offense of grand larceny.[1] Count 1 of the indictment on which ap-

1. D.C.Code, § 22–2201 (1961): "Whoever shall feloniously take and carry away anything of value of the amount or value of $100 or upward, including things savoring of the realty, shall suffer imprisonment for not less than one nor more than ten years."

pellant was tried charged James G. Cross, James Landriscina and others not named as defendants, with conspiracy, in violation of 18 U.S.C. § 371 and § 1503 (1958), to effect a corrupt acquittal of Cross in his trial on a charge of perjury. It further charged that one co-conspirator paid Levin a total of $35,000, the property of the Bakery and Confectionery Workers' International Union of America, which property was entrusted to James G. Cross, its president.

Count 2 of the indictment charged Levin as follows: [2]

"On or about February 13, 1959, within the District of Columbia, and within the jurisdiction of this Court, defendant Milton M. Levin did unlawfully, feloniously and willfully steal, take and carry away the property of the Bakery and Confectionery Workers' International Union of America, an unincorporated association, entrusted to James G. Cross, President of said union, the said property consisting of $35,000 in money in violation of Title 22, District of Columbia Code, Section 2201."

Count 3 of the indictment charged Cross with having embezzled $35,000 from the Union.

Levin was found guilty of grand larceny as charged in Count 2 of the indictment, and his appeal is now before this court for determination.

The trial was a lengthy one. While the testimony of Landriscina regarding Levin's receipt of the money was specifically denied by Levin, there are corroborating circumstances which bear out the Government's case. In her charge to the jury, the trial judge set out fairly the contentions of the Government and of the defendant, as follows:

"Briefly, I shall tell you what the government claims in this case and then I shall tell you what the defendant claims.

"The government contends that Mr. Levin, the defendant, represent-ed to Mr. Cross, President of the Union and to Mr. Landriscina, another Union officer, that he, the defendant, Mr. Levin, could fix the Cross perjury case if he were given $35,000 to use in the fixing; that $35,000 in cash, of the money belonging to the Union, was by direction of Mr. Cross turned over to Mr. Landriscina, that Mr. Landriscina then turned over the $35,000 to the defendant, Mr. Levin, in order that Mr. Levin might use the money to bribe court officials, or a court official and jurors in a case in which Mr. Cross was the defendant and in which he was charged with perjury. And the government further contends that the defendant, Mr. Levin, just pretended that he would bribe people and that when he took the $35,000, it was with the intent of appropriating it to his own use. That, as I said, is what the government contends.

"On the other hand, Mr. Levin denies that he ever had any understanding with anyone to fix the Cross perjury trial and he denies receiving the $35,000 mentioned in the indictment, or any part of it. He concedes that he had conversations with certain Union officials and that he saw them, but he says these conversations were primarily about his employment as a lobbyist or as general counsel for the Union, and that checks he received from the Union were for services rendered."

Appellant concedes that the evidence on behalf of the government, if believed by the jury, as it evidently was, was sufficient to support the charge in the indictment; and unless the questions of law urged by appellant are well taken, the judgment of conviction must be affirmed.

I

Appellant first contends that there was no evidence showing that he committed larceny by trick of the Union's money. Reduced to its pertinent essentials, appel-

---

2. Appellant was tried separately and, of course, on Count 2 only.

lant's contention is that the essence of larceny by trick is a fraudulent inducement of the *true owner* to convey his property to the thief. Thus, inasmuch as the indictment charged appellant only with larceny of money belonging to the Union, the conviction cannot stand since Cross, from whom the money was received, had embezzled the money from the Union and thus was not its true owner.

We think this is a misconception of the nature of the crime of larceny, which is an offense against the possession rather than the ownership of property. As indicated by the statute, the gist of the crime is the felonious taking and carrying away of anything of value and, under the terms of our statute, as distinguished from those of certain other jurisdictions, the ownership of the property does not matter. Even granting that Cross was a thief, or embezzler, it would be no defense that the defendant stole from the thief, for it is well settled that one who steals money or property which itself had been stolen by another may be prosecuted notwithstanding the illegality of his victim's possession. This principle has been followed in a number of cases wherein it was held or recognized that stolen money or other property may be a proper subject of larceny or a crime involving larceny such as robbery or forgery.[3]

Appellant further contends that the essence of the offense of larceny here involved is a fraudulent inducement, the elements of which are: (1) false representation; (2) with reference to a material fact; (3) acknowledgment of the falsity; (4) intent to deceive; and (5) action taken in reliance upon the representation. In the trial proceedings, the judge so charged the jury. Appellant argues, however, that since the officers with whom he dealt had acted outside the scope of their authority in embezzling or conspiring to embezzle the money from the Union, any representations to them by the appellant, or reliance by them on such representations, were not those of the Union. As a result, since the essential elements of false representation and reliance were not present as against the Union, appellant could not be found guilty of larceny by trick with regard to the Union. In so arguing, however, appellant mistakenly assumes that under the indictment and the statute it would be necessary to show that Cross was authorized to conduct the transaction for the Union. However, the indictment reads that defendant did "take and carry away the property of the * * * Union * * * *entrusted* to James G. Cross." [Emphasis added.] There was no requirement that it be shown that the money was received *from* the Union, but rather (1) that the money was that *of* the Union, and (2) that it was the money "entrusted" to Cross.

That the money can be considered to have been "entrusted" to Cross, within the meaning of that phrase in the indictment, is clear. Granted, as it must be, that Cross was a faithless agent, nevertheless, he was at the very least a trustee *ex maleficio*. Moreover, with regard to the actual ownership of the money, appellant in his brief states:

"* * * and of course the money still belonged to the Union notwithstanding the circumstance that Cross had embezzled it from the Union the day before * * *."

Hence it seems clear to us that there was sufficient evidence by which the jury could find that appellant had committed larceny of the Union's money as charged in the indictment and appellant's argument on this point is without merit.

3. E.g., State v. Pokini, 45 Haw. 295, 367 P.2d 499, 89 A.L.R.2d 1421 (Hawaii 1961); State v. Bowden, 62 N.J.Super. 339, 162 A.2d 911 (1960); Hall v. State, 160 Tex.Cr.R. 553, 272 S.W.2d 896 (1954); State v. Wales, 168 La. 322, 122 So. 52 (1929); Smith v. State, 187 Ind. 253, 118 N.E. 954, L.R.A.1918D, 688 (1918); Maxwell v. Territory, 10 Ariz. 1, 85 P. 116 (1906); Commonwealth v. Rourke, 64 Mass. (10 Cush.) 397 (1852).

## II

Appellant's second point is that reversible error was committed by the trial court in excluding Rabbi Isaacson's testimony as to appellant's religious habits and as to the requirements of the Jewish Orthodox ritual. A résumé of the evidence showing the significance of this point seems indicated.

At the trial, the Government introduced testimony by Landriscina that he gave $10,000 in small bills to appellant on the morning of February 12, 1959,[4] and the balance ($25,000) of the agreed $35,000 at about 5:00 p. m. on Friday, February 13, 1959. These transfers, it was testified, were made in a park near the Statler Hotel in Washington, D. C. On the other hand, appellant testified that Landriscina did not give him any money in the District of Columbia on either February 12 or February 13, 1959, that he (appellant) checked into a hotel in the District of Columbia at 5:43 p. m. on February 12, 1959,[5] that he was not in the District on the morning of February 12, that he left the District not later than 1:00 p. m. on February 13, and got to his home in Little Neck, Queens, Long Island, New York, somewhere "between four and five o'clock or before then," and that he was home on February 13, 1959, at five o'clock (p. m.). In response to the question "How do you fix that you were at home?" he stated:

> "Friday afternoon is the Sabbath, which we observe quite diligently, and I never go away from home and my family on the Sabbath."

Upon inquiry by the trial judge, he stated that he remembered being at home on that Friday, February 13, 1959. His testimony in this respect was corroborated by his wife who testified that her husband was home on Friday, February 13, 1959, "after four, about twenty after four, four-thirty at the very latest" according to her best recollection.

Appellant testified further that "I would think I took the train" to come to Washington on February 12. He stated that he had no checks for February, 1959, evidencing any payment to a railway company and "when I take the train, if I were to take the train, I would pay by cash." Appellant's cancelled check in the amount of $13.81 dated February 11, 1959, payable to Eastern Airlines, representing the one way fare between New York and Washington at that time was identified. Appellant testified that the check represented a trip "to or from Washington," and that—

> "It is very likely that that was a reservation. If I were coming back on the 13th, which was a Friday, I would make a reservation long enough in advance to insure."

From the above résumé, it is apparent that appellant's testimony, corroborated in part by the testimony of his wife, if credited by the jury, would establish that he took a plane from the District of Columbia to New York not later than 1:00 p. m. on Friday, February 13, 1959, and that he was not in the District but was at home at 5:00 p. m. on that date. His testimony, if credited, would also require the conclusion that he was not in Washington on the morning of February 12, 1959, and that although appellant admittedly was in Washington on the morning of February 13, 1959, up until 1:00 p. m., he did not meet with or receive any money from Landriscina on that morning.

---

4. Other witnesses for the Government through whom Landriscina got the $10,000 in small bills gave testimony indicating that Landriscina did not receive the $10,000 until the morning of Friday, February 13, 1959. The jury thus could infer, if it credited this testimony and that of Landriscina that he paid the $10,000 to the appellant, that Landriscina was mistaken as to the date and that the transfer took place on February 13 instead of February 12.

5. The hotel records show that he checked in at 5:43 on February 12, 1959, and checked out at 11:30 a.m. on February 13, 1959. Whether the check-in time was 5:43 a.m. or 5:43 p.m. was not recorded. Appellant stated that it was p.m. because "I just know I wouldn't be checking into a hotel at 5:43 in the morning."

Appellant offered and there was received, supplementing this direct evidence, the testimony of seven acquaintances, neighbors, and friends, including Rabbi Irwin Isaacson, appellant's wife, and a Catholic priest, that his reputation for honesty, truthfulness, and integrity was excellent. In addition some of these persons [6] testified generally as to appellant's religious habits, stating variously that appellant was very religious, that the Orthodox Jewish Sabbath commenced at sundown Friday and ended at sundown Saturday, that appellant never worked on the Sabbath, that it was his habit faithfully to observe the Sabbath, that he was always home at that time, that he was not available for telephone calls, and that he never drove his car on the Sabbath.

After Rabbi Isaacson had testified that appellant's reputation for truthfulness, honesty and integrity was excellent, the following tender was made by counsel for appellant:

"I wish to go into the subject matter with this witness concerning Mr. Levin's habit of being home on the Sabbath [7] and using him as an expert to testify when the Sabbath commenced and what Orthodox ritual requires."

■ This testimony was ruled inadmissible, and appellant contends that this constituted reversible error. We disagree.

■ According to the weight of authority, evidence of the general habits of a person is not admissible for the purpose of showing his conduct upon a specific occasion.[8] Thus in personal injury

6. These included a friend and neighbor, living two houses away; a part-time office secretary; and his telephone answering secretary. A friend of 12 years standing was not permitted to testify as to appellant's "habits" as such but was permitted to testify that she had never seen him away from home or riding on Friday evenings; that she had visited him in his home on Friday evenings; that she had tried to telephone him on Friday evenings but didn't get an answer; that she lived by the Temple attended by the appellant in the years 1955 to 1957; that "on many Friday afternoons" in those years appellant parked his car in her driveway never later than 3:45 p.m.; that he would then walk home, would return for Temple, and then after sundown on Saturday would have his car "right there to use to ride home." Appellant's wife not only testified, as already indicated, that her husband was home at "four thirty at the very latest" on Friday, February 13, 1959, but also gave testimony as to her husband's habits with respect to the Sabbath. She stated, for example, that "my husband is always with me on Friday nights. * * * He was always with me, the only time [exception] is when I went to give birth with my daughter, I had to go on a Friday night and he took me to the hospital and walked home." Again, "Well, my husband is always home when I light the candles on Friday night * * *." With respect to the time her husband was home on Fri-

day, February 13, 1959, she said: "Well, it would be before six, it had to be before sundown on Friday because he is always home then. * * * I light the candles at a certain time and that would be an hour before." Asked what time she lighted the candles on February 13, 1959, she said:

"Well, it would be—every year it varies and I have a calendar which tells me what time to light the candles—this year it was about eleven minutes after five and that is seventeen minutes before sunset."

She said also that her husband never worked on Saturday, although at times he did work after the Sabbath ended—at sundown Saturday.

7. Apart from the testimony as to appellant's reputation, the Rabbi had testified only that he had been a Rabbi in the active ministry for 18 years, that he knows the appellant and at one time lived in his neighborhood. The Rabbi notably did not state that he was the Rabbi of the Temple attended by the appellant. Thus, no foundation was laid which suggests that the Rabbi could or would state that appellant was always, without exception, home on the Sabbath or that he was in fact at home at the beginning of the Sabbath on Friday, February 13, 1959.

8. Weaver v. Scofield, (Mo.App.) 198 S.W. 2d 240 (1946); State v. Lapan, 101 Vt. 124, 141 A. 686 (1928); Petro v. Hines, 299 Ill. 236, 132 N.E. 462, 18 A.L.R. 1106

cases, evidence of the habits of care or negligence of the injured party is not admissible in proving his care or negligence at the time of his injury.[9] Moreover, as stated in State v. Lapan, 101 Vt. 124, 141 A. 686, 694 (1926):

> "Ordinarily, it cannot be proved that a person did a particular thing on one occasion by showing that he did it at another time or times."

Appellant argues, however, citing 1 Wigmore, Evidence § 92, p. 519 (3d ed. 1940) that evidence of habit is of probative value and thus the intended testimony here should have been received. We agree with appellant that evidence of habit is of *some* probative value, although it is far inferior to direct evidence as to what was done at the time and date in question. Certainly those cases which reject such evidence do not do so on the ground that it is of *no* probative value. Rather, in the words of the court in Zucker v. Whitridge, 205 N.Y. 50, 98 N.E. 209, 213, 41 L.R.A.,N.S., 683 (1912):

> "Sometimes it is necessary to weigh the probative force of evidence offered, compare it with the practical inconvenience of enforcing a rule to admit it, and decide whether, as a matter of good policy, it should be admitted. Uniform conduct under the same circumstances on many prior occasions may be relevant as tending somewhat to show like conduct under like circumstances on the occasion in question. All relevant evidence, however, is not competent. * * * So, assuming the evidence in question to be relevant, I think it should be held incompetent under the circumstances, because its probative force does not outweigh the inconvenience of a multitude of collateral issues, not suggested by the pleadings, the trial of which would take much time, tend to create confusion and do little good. * * * Habit is an inference from many acts, each of which presents an issue to be tried, and necessarily involves direct, and naturally invites, cross examination. The circumstances surrounding each act present another issue, and thus many collateral issues would be involved which would not only consume much time, but would tend to distract the jury and lead them away from the main issue to be decided. From the want of previous notice, the other party would not be prepared to meet such evidence; and after all the testimony of this character was in the fact would remain that, as no one is always careful, the subject of inquiry, although careful on many occasions, might have been careless on the occasion in question."

Dean Wigmore himself acknowledges the extent to which the probative value of habit evidence may vary:

> "There is, however, much room for difference of opinion in concrete cases, owing chiefly to the indefiniteness of the notion of habit or custom. If we conceive it as involving an invariable regularity of action, there can be no doubt that this fixed sequence of acts tends strongly to show the occurrence of a given instance. But in the ordinary affairs of life a

---

(1921); Noonan v. Luther, 206 N.Y. 105, 99 N.E. 178, 41 L.R.A.,N.S., 761 (1912); Zucker v. Whitridge, 205 N.Y. 50, 98 N.E. 209, 41 L.R.A.,N.S., 683 (1912). See Thompson v. Bowie, 71 U.S. (4 Wall.) 463, 18 L.Ed. 423 (1866); 20 Am. Jur. § 332, p. 310.

9. Thomas v. Kimsey, (Mo.Sup.) 322 S.W. 2d 754 (1959); Poole v. Evergreen Livestock Co., 262 Ala. 131, 77 So.2d 475 (1955); Lowenthal v. Mortimer, 125 Cal. App.2d 636, 270 P.2d 942 (1954); MacGillivray v. First Nat. Stores, 326 Mass. 678, 96 N.E.2d 159 (1951); Harper v. Dees, 214 Ark. 111, 214 S.W.2d 788 (1948); Cox v. Norris, 70 Ga.App. 580, 28 S.E.2d 888 (1944); Parsonnet v. Keil's Newark Bakery, 119 N.J.L. 301, 196 A. 661 (1938); Blondeau v. Sommer, Tex.Civ.App., 99 S.W.2d 668 (1936); Moore v. American Stores Co., 109 Md. 541, 182 A. 436 (1936); Wyatt v. Russell, 308 Pa. 366, 162 A. 256 (1932); Laufer v. Bridgeport Trac. Co., 68 Conn. 475, 37 A. 379, 37 L.R.A. 533 (1897). See Perkins v. United Transp. Co., 219 F. 2d 422 (2d Cir. 1955)

habit or custom seldom has such an invariable regularity. Hence, it is easy to see why in a given instance something that may be loosely called habit or custom should be rejected, because it may not in fact have sufficient regularity to make it probable that it would be carried out in every instance or in most instances." 1 Wigmore, *supra at* 520.

It seems apparent to us that an individual's religious practices would not be the type of activities which would lend themselves to the characterization of "invariable regularity." Certainly the very volitional basis of the activity raises serious questions as to its invariable nature, and hence its probative value. As Chamberlayne has observed:

"The probative force of habit, whether the question arises in a civil or criminal case, is based principally upon the fact that habitual conduct is largely free from the complicating and confusing element of volition which makes the relevancy of moral conduct merely deliberative, but, on the contrary, brings such conduct in line with the activities of the body which are under the control of the subliminal mind, i. e., are of the automatic nature, practically under the uniformity of natural law. In fact, the probative strength of habit is in proportion to the extent to which it assumes this automatic character."

Chamberlayne, Modern Law of Evidence § 3204, p. 4433. Needless to say, the observance of the Sabbath in a particular manner involves a volitional assent, however guided or instructively urged.

Appellant argues that Howard v. Capital Transit Co., 97 F.Supp. 578 (D.D.C. 1951) is authority in this jurisdiction for the admissibility of the testimony offered. In that case, a wrongful death action, the District Court admitted circumstantial evidence of the decedent's possession of a weekly pass for the defendant transit company's bus service. The court found that such evidence had probative value respecting the issue of whether the decedent was a passenger on the bus at the time of the occurrence. In the court's words:

"In view of the fact that decedent's lips were sealed and there were no witnesses who could positively identify him as having been a passenger, this evidence was logically relevant and material, and I am aware of no exclusionary rule requiring its rejection".

97 F.Supp. at 579. It is apparent that the absence of decedent's testimony and the lack of eyewitnesses were the critical factors considered by the court in admitting the evidence. There appears indeed to have been no evidence in that case of the decedent's "habit" as such to ride the buses of the defendant company on the route and at the time in question. The court stated merely:

"Assuming, arguendo, that this and other evidence had the effect of showing the habit or custom of deceased in using defendant's buses to return home from his place of employment, there is convincing authority for its admissibility for such purposes." *Ibid.*

Consequently the case is readily distinguishable from this one as coming within the exception to the rule in personal injury suits, supported by the overwhelming weight of authority, that evidence of habit or custom is not admissible where there are eyewitnesses to the accident.[10]

This case is one requiring the jury to choose between the testimony of Landriscina and of the appellant, both alleged

---

10. Whittenmore v. Lockheed Aircraft Corp., 65 Cal.App.2d 737, 151 P.2d 670 (1944); Jackson v. Chesapeake & O. Ry. Co., 179 Va. 642, 20 S.E.2d 489 (1962); Holcombe v. W. N. Watson Supply Co., 171 S.C. 110, 171 S.E. 604 (1933); Petro v. Hines, 299 Ill. 236, 132 N.E. 462 (1921). Cf. Annot., 15 A.L.R. 125; Annot., 18 A.L.R. 1106; 9C BLASHFIELD, CYCLOPEDIA OF AUTOMOBILE LAW & PRACTICE, 296 *et seq.*; 4 CHAMBERLAYNE, MODERN LAW OF EVIDENCE §§ 3195–98; 2 JONES COMMENTARIES ON EVIDENCE §§ 687–89.

participants in the contested payment of money, and thus in a sense both "eyewitnesses." Certainly neither the fact that Landriscina was a prosecution witness nor the fact that both his and Levin's veracity were under attack would be sufficient to require, as a matter of law, the admission of further cumulative evidence [11] of the appellant's habit of being at home before sundown on Fridays.[12] As already indicated appellant's wife not only testified as to his presence at home after 4:30 p. m. on the Friday in question, but she, as well as others (see note 6 *supra*), gave habit testimony. And, as indicated, the tender with respect to the Rabbi was not accompanied by a sufficient showing for admission of his testimony as to appellant's habits.

Even on the assumption that the Rabbi might have become appellant's "weightiest witness," as his brief characterizes the Rabbi, we do not think it was reversible error to exclude further cumulative evidence as to appellant's Sabbath habits in the circumstances here.[13] The prosecution did not dispute his general habit to be home on Friday evenings, but only his whereabouts on a particular Friday evening. It is not unimportant in this connection that, under the evidence adduced by the prosecution, $10,000 of the amount said to be involved was allegedly paid to the appellant on the morning of Thursday, February 12, or the morning of Friday, February 13. Further habit evidence as to Friday evenings would not have pertained to those times.

Nor do we think it was an abuse of discretion on the part of the District Court not to receive the Rabbi's expert testimony as to "when the Sabbath commenced and what Orthodox ritual requires." Witnesses had already testified as to when the Sabbath commenced and when it ended. There was abundant evidence as to appellant's devotion and reverence and his habit of being at home with his family at the beginning of the Sabbath. His whereabouts at that time on a particular date, February 13, 1959, is one of the facts in issue in this case, but the requirements of Orthodox ritual generally, apart from that particular requirement, have no present relevance.

It is urged also that the prosecution's witness Landriscina was contradicted in some respects by prosecution exhibits and other prosecution witnesses, and the case was thus a close one. The effect of the contradictions of Landriscina's testimony by other evidence was solely for the jury to weigh, under credibility instructions which we believe were adequate and

11. Appellant acknowledges on brief that there was evidence in the record showing his fixed habit as an Orthodox Jew to be at home with his family by sundown every Friday for the Sabbath observance.

12. Gillette Motor Transport, Inc. v. Kirby, 208 Okl. 68, 253 P.2d 139 (1953); Petro v. Hines, 299 Ill. 236, 132 N.E. 462 (1921). See also note 13, and cases there cited.

13. It is well settled that the receipt of further cumulative evidence in a criminal trial lies within the sound discretion of the trial judge. See our decision in Burgman v. United States, 88 U.S.App.D.C. 184, 188–189, 188 F.2d 637, 641–642, cert. denied, 342 U.S. 838, 72 S.Ct. 64, 96 L.Ed. 1347 (1951); Suhay v. United States, 95 F.2d 890 (10th Cir. 1938), cert. denied, 304 U.S. 580, 58 S.Ct. 1060, 82 L. Ed. 1543 (1938); Chapa v. United States, 261 F. 775 (5th Cir. 1919), cert. denied, 252 U.S. 583, 40 S.Ct. 393, 64 L.Ed. 728 (1920). And see as to character evidence United States v. Baysek, 212 F.2d 446, 447 (3d Cir.), cert. denied, 348 U.S. 836, 75 S.Ct. 49, 99 L.Ed. 659 (1954); Shaw v. United States, 41 F.2d 26, 27–28 (5th Cir. 1930); Brady v. United States, 41 F.2d 449, 451 (7th Cir. 1930); Hauge v. United States, 276 F. 111 (9th Cir. 1921). The District Court's original theory in this case was that an alibi could not successfully be established by evidence of habit, but as indicated, the only habit testimony actually excluded was that of the Rabbi. We cannot hold this reversible error. In addition to what is said above, we note on the question of "weightiness" that the order in which appellant's witnesses were called was the choice of himself (a lawyer) and his retained counsel, and that the reservation of the Rabbi until the last to give evidence as to a habit already testified to must have been a deliberate choice made with knowledge of the possible consequences.

which are not challenged here. The closeness of the case was also a matter to be resolved by the jury, particularly where as here the credibility of both alleged participants as witnesses was in issue. We note that the jury returned with its verdict in 1¾ hours.

### III

Appellant next contends that the court incorrectly instructed the jury regarding the weight it could attach to such testimony relating to appellant's religious habits as was admitted. Appellant's trial counsel requested that the jury be instructed as follows:

"There has been evidence of the fixed habit of the defendant, Milton M. Levin, concerning his presence at his home on Friday evenings for the observance of his Sabbath. You may consider this evidence as proof of his contention that he was at his home in New York on Friday, February 13, 1959, at approximately 5:00 o'clock p. m."

Appellant's counsel concedes before us, as indeed he must, that this requested instruction was improper and was correctly denied. He contends, however, that the instruction actually given was erroneous and that it was objected to before the jury retired.

The trial judge advised counsel that she would instruct the jury on the question of the weight to be given to the evidence referred to, and did in fact instruct the jury as follows:

"It is my recollection that Mr. Levin testified, as did other witnesses, that he has a habit or practice of a religious nature whereby he stays at home from sundown Fridays to sundown Saturdays. You are told that proof of such a habit or practice is not proof that the defendant is never elsewhere at that particular time."

After the court had concluded its charge, counsel were asked if there were any objections or requests and were told that if there were, counsel should come to the bench. At this time, counsel for appellant stated:

"I object to Your Honor's instructions as given concerning custom and habit.

"And I re-offer Instructions Nos. 12 and 13 * * * 13 was my instruction to the converse of custom and habit."

The trial judge responded regarding the offered Instruction 12, counsel thanked the court, and nothing further was said by counsel regarding the refused Instruction (13) on custom and habit, set out above and now conceded to be erroneous. No request was made that the charge as given be changed, corrected, or clarified in any manner.

We do not regard the charge as erroneous in the circumstances here and in any event it does not seem unduly prejudicial. Proof of habit, for religious reasons, to be at home on Friday evenings clearly is not conclusive proof that the person having the habit may not be elsewhere on occasion and particularly on the specific Friday evening in issue. Here, of course, as already pointed out, there was direct testimony by appellant and his wife that he actually was at home at sundown on the precise Friday involved, as the District Court clearly brought to the attention of the jury.

The instruction must of course be considered in context with the District Court's instructions to the jury as a whole. When so considered, the habit instruction appears to us not to have had any prejudicial effect. The habit instruction was immediately followed by the following:

"You are further told that Mr. Levin has interposed in this case a defense known as an alibi. There has been testimony to the effect that the defendant was not present at the time and place when the offense with which he is charged was allegedly committed. It is my recollection that Mr. Levin testified to that effect and that Mrs. Levin did, also. However, you are to be guided by your own

recollection of their testimony. You are told that the defense of alibi is a legitimate, legal and proper defense. The evidence adduced in support of this defense, however, like all other evidence in the case, should be given such weight and such consideration by the jury as the jury may think it is entitled to receive under all the facts and circumstances of the case.

"If after a full and fair consideration of all the facts and circumstances in evidence, the jury finds that the government has failed to prove beyond a reasonable doubt that the defendant was present at the time and place of the commission of the offense charged in the indictment, then one of the essential elements of the offense would be lacking and, in that event, it would be your duty to find the defendant not guilty."

Other instructions which have importance with respect to the overall effect of the habit instruction are set out below.[14]

In Rule 30, FED.R.CRIM.P., it is provided, in part:

"No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects *and the grounds of his objection.*" [Emphasis supplied.]

FED.R.CRIM.P. 51 provides that, while exceptions to rulings or orders of the court are unnecessary, it is sufficient that a party, at the time of the ruling or order, make known to the court the action he desires the court to take or his objection to the action of the court *and the*

*grounds therefor.* This was not done in the present case. Appellant's trial counsel was insistent on his own instruction, and did not state "grounds for his objection" to the court's charge. Nor do we see any reason for exercising our discretion under FED.R.CRIM.P. 52(b).

## IV

Finally, it is urged that it was reversible error to exclude the testimony of Landriscina before the Grand Jury since it was claimed that evidence contradicted, in significant particulars, his testimony at the trial.

 What happened, as disclosed by the record, was that appellant requested access to the transcript of the Grand Jury testimony, or an *in camera* inspection. He stated to the court the matters in which he was interested and, acceding to his request, the court conducted an *in camera* inspection and concluded that there were no inconsistencies so far as she could see. However, the court stated that although she could see no inconsistencies, defense counsel "might see some inconsistency that I did not see," since "he has been living with this case a long time. I have not." Accordingly she read aloud, in the presence of counsel for both sides, the questions and answers of Landriscina's Grand Jury testimony respecting the issues in which appellant stated he was interested. He now complains that he should have been given the questions and answers to read. The fact is that after hearing the questions and answers read by the court, he said "Thank you very much, Your Honor" and did not ask the court for further relief. He apparently was satisfied with the manner in which the hearing before the Grand

14. The court also instructed the jury that they were the sole judge of the credibility of each witness and gave full instructions regarding all the factors to be considered in determining credibility. It referred to the problem of contradiction in testimony. It instructed that the jury was to treat as evidence "those *inferences* which to your mind logically and reasonably arise from the evidence." [Emphasis supplied.] It told the jury that they must have no reasonable doubt concerning the defendant's guilt, and explained the term in detail, including the need to weigh the evidence of the defendant's good reputation. It instructed the jury as to the elements of the offense, including the statement, later repeated in substance as set out above, that the jury must find beyond a reasonable doubt that "all this occurred in the District of Columbia on or about February 13, 1959."

Jury was presented to him. Under these circumstances, we can find no error affecting substantial rights.

We believe the appellant had a fair trial and no error appearing, the judgment of conviction is affirmed.

Affirmed.

BAZELON, Chief Judge (dissenting):

Levin's conviction of grand larceny was substantially based on testimony of James Landriscina that he met Levin in Washington, D. C., at 5:00 p. m., Friday, February 13, 1959, and gave him $25,-000.[1] Levin testified that he was in Washington that day but that he left in the early afternoon. Levin attempted to support his alibi by establishing his religious habit of always being home with his family in New York on the Jewish Sabbath—sundown Friday through sundown Saturday.

The majority here accepts the rule generally followed by courts and commentators that habit evidence, if specific enough, may be admitted. Such evidence is logically probative and no rule excludes it. Whether its probative value is worth the excursion into collateral issues that proof of the habit may require depends on the particular facts of a case. Such questions are generally confided to the trial court's discretion. In this case, the trial court apparently had in mind neither the probative value of habit evidence nor the inconvenience of an excursion into collateral issues. It took the view that the evidence of habit may not be used to prove alibi in a criminal case. This view has no support in reason or authority and its application here was highly prejudicial.

I think that in the circumstances of this case—where the central issue concerned an event four years before the trial and the testimony of the sole alleged eyewitness was open to suspicion [2]—the defendant was clearly entitled to support his alibi with evidence of his religious habit. The question remains whether he was effectively denied the opportunity to do so, either because his introduction of such evidence was too sharply curtailed or because the trial court's rulings and charge dissipated the value of the habit evidence he did introduce.

Exclusion of the rabbi's testimony of habit was probably not prejudicial in view of the similar testimony presented by other witnesses. But I think the value of their testimony was vitiated by the court's erroneous rulings and charge. Because the question of guilt was close, I think these errors require reversal of the conviction.

The court told counsel that habit evidence was irrelevant. See TR 627–634. It also told counsel it would instruct the jury that evidence of the defendant's habit of doing something is no proof that he did so on a particular occasion, TR 634, and that all matters with respect to habit and custom were to be excluded and stricken. TR 633, 925. On one occasion the court cut off questioning when defense counsel began inquiring into appellant's habit, saying in the presence of the jury:

"Mr. Stein, we are not concerned here with what Mr. Levin has done all the rest of his life." [TR 627]

All this may well have discouraged defense counsel from attempting fully to explore the matter with any witness, and may well have led the jury to believe it could not consider appellant's habit in determining whether he had or had not

---

1. Landriscina also testified he gave Levin $10,000 on Thursday morning, February 12. But other union officials testified Landriscina did not receive the $10,000 until Friday morning. See note 4 *infra*, and majority opinion, note 4 *supra*.

2. At least where the proffered habit evidence tends to show that an event never took place, I see no reason to exclude

the habit evidence simply because there is a purported eyewitness to the event. McCormick, Evidence 342 n. 9 (1954); Morgan, Maguire & Weinstein, Cases and Materials on Evidence 390 (1957). That direct evidence is more weighty than habit evidence is adequately conveyed by an instruction; it does not call for exclusion of the "inferior" evidence.

met Landriscina and received the money at 5:00 on a Friday afternoon.

If there was any question about this in the jurors' minds, it must have been resolved by the court's charge. The court told the jury:

> "It is my recollection that Mr. Levin testified, as did other witnesses, that he has a habit or practice of a religious nature whereby he stays at home from sundown Fridays to sundown Saturdays. You are told that proof of such a habit or practice is not proof that the defendant *is never elsewhere* at that particular time."

The majority, in finding that this charge was not erroneous in the circumstances here, says:

> "Proof of habit, for religious reasons, to be at home on Friday evenings clearly is not *conclusive* proof that the person having the habit may not be elsewhere on occasion and particularly on the specific Friday evening in issue." [Emphasis supplied.]

Such a charge would have been correct. But the charge given did not use the word "conclusive"; it said proof of the habit is "not proof". In light of all that had gone before, and especially the court's statement of how it expected to charge

the jury, I cannot assume the omission of the word "conclusive" was unlikely to mislead the jury.[3] Rather, it fits the pattern, consistently maintained throughout the trial, of not allowing the jury to consider habit evidence in relation to Levin's alibi.

The trial lasted eight days; the transcript is 1076 pages long. Despite the effort and expense involved in a new trial, I think one is required. In determining whether error was prejudicial, the closeness of the case is a crucial consideration. Edwards v. United States, 265 F.2d 302 (9th Cir. 1959). Here the only witness directly implicating appellant was Landriscina, who claimed to be the other party to the transaction. Landriscina had already pleaded guilty to conspiracy to obstruct justice under another count of the indictment involved here. His testimony was thus subject to impeachment and was in fact impeached. His testimony as to dates and times was contradicted by other prosecution witnesses.

A jury in this jurisdiction is permitted to believe the uncorroborated testimony of an accomplice, or testimony corroborated circumstantially by other accomplices;[4] and the Government may establish a prima facie case with testimony that is contradictory in several material respects. But I think we cannot hold, as

3. That defense counsel's requested instruction was erroneous means that denying it without more would not have been error. The error here was not refusing to give the requested instruction; it was giving the prejudicial instruction.

4. Several union officials testified that a check for $35,000 was cashed on Friday, June 13. But only Vincent Belloni, who the court charged might be an accomplice, gave testimony tending to connect Levin with the money. Belloni testified that in January 1959 he and Landriscina visited Levin's New York office where they discussed Cross' legal representation at his pending perjury trial. Nothing was said about fixing the case. Belloni had a subsequent conversation with Levin at the latter's New York office:

> "I told him that Jimmy had called me and had told me that Mr. Levin wanted

$35,000 for the case, and Jimmy had told me to speak to Mr. Levin to see if he could bring the price down and where the money was going.
> * * * * *
> "Mr. Levin says no, that would be the price and what's the difference where the money would go.
> "Q. Did he say anything more?
> "A. What's the difference where the money would go as long as the job is done."

Belloni did not think there was anything wrong or irregular about the questions he propounded to Levin at Landriscina's request. A few days after Cross' perjury trial had terminated, Levin called Belloni on the telephone and told him "when I say something will be done it is usually done." In several conversations with Belloni, Levin never said whether or not he received the $35,000.

a matter of law, that evidence tending to exculpate the defendant would have been unlikely to influence the jury's decision if the jury had been allowed to consider it. I would grant a new trial.